Window World of Baton Rouge, LLC v. Window World, Inc.; Window World of St. Louis, Inc. v. Window World, Inc., 2019 NCBC 53.

STATE OF NORTH CAROLINA

WILKES COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1

WINDOW WORLD OF BATON
ROUGE, LLC; WINDOW WORLD OF
DALLAS, LLC; WINDOW WORLD
OF TRI STATE AREA, LLC; and
JAMES W. ROLAND,

                Plaintiffs,

  v.

WINDOW WORLD, INC.; WINDOW
WORLD INTERNATIONAL, LLC;
and TAMMY WHITWORTH,

                Defendants.

**ORDER AND OPINION ON
PLAINTIFFS' PRIVILEGE MOTIONS,
WINDOW WORLD DEFENDANTS'
MOTION TO STRIKE, AND PARTIES'
RULE 53(G) EXCEPTIONS TO
SPECIAL MASTER'S REPORT
[Public][1]**

WILKES COUNTY

15 CVS 2

WINDOW WORLD OF ST. LOUIS,
INC.; WINDOW WORLD OF KANSAS
CITY, INC.; WINDOW WORLD OF
SPRINGFIELD/PEORIA, INC.;
JAMES T. LOMAX III; JONATHAN
GILLETTE; B&E INVESTORS, INC.;
WINDOW WORLD OF NORTH
ATLANTA, INC.; WINDOW WORLD
OF CENTRAL ALABAMA, INC.;
MICHAEL EDWARDS; MELISSA
EDWARDS; WINDOW WORLD OF
CENTRAL PA, LLC; ANGELL P.
WESNERFORD; KENNETH R. FORD,
JR.; WORLD OF WINDOWS OF
DENVER, LLC; RICK D. ROSE;
CHRISTINA M. ROSE; WINDOW

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court has allowed to remain filed under seal in these actions, the Court elected to file this Order and Opinion under seal on August 16, 2019. The Court then permitted the parties an opportunity to propose redactions to the public version of this document. Plaintiffs did not propose any redactions. The Court has accepted the redactions currently proposed by Defendants Window World, Inc. and Window World International, LLC.

WORLD OF ROCKFORD, INC.;
WINDOW WORLD OF JOLIET, INC.;
SCOTT A. WILLIAMSON; JENNIFER
L. WILLIAMSON; BRIAN C.
HOPKINS; WINDOW WORLD OF
LEXINGTON, INC.; TOMMY R.
JONES; JEREMY T. SHUMATE;
WINDOW WORLD OF PHOENIX
LLC; JAMES BALLARD; and TONI
BALLARD,

          Plaintiffs,

v.

WINDOW WORLD, INC.; WINDOW
WORLD INTERNATIONAL, LLC; and
TAMMY WHITWORTH, individually
and as trustee of the Tammy E.
Whitworth Revocable Trust,

          Defendants.

1.    **THIS MATTER** is before the Court upon the following motions and related matters in the above-captioned cases: (i) Plaintiffs' Motion for Finding of Waiver of Attorney-Client Privilege and Work-Product Doctrine as to Certain Topics (the "Waiver Motion"); (ii) Plaintiffs' Motion to Compel and Motion for Sanctions for Defendants' Wrongful Assertions of Privilege (the "Motion to Compel" and, together with the Waiver Motions, the "Privilege Motions"); (iii) Defendants Window World, Inc. and Window World International, LLC's (together, "WW") Motion to Preclude Consideration and/or Strike Portions of the Affidavit of Sean Gallagher (the "Motion to Strike," and, together with the Privilege Motions, the "Motions"). Also before the Court are (i) WW's Rule 53(g) Exceptions to Report of Special Master ("WW's

Exceptions") and (ii) Plaintiffs' Exceptions to Special Master's Report ("Plaintiffs' Exceptions," and, together with WW's Exceptions, the "Exceptions").

2. Having considered the Motions and the Exceptions, the parties' briefs in support thereof and in opposition thereto, the relevant materials associated with the Motions and the Exceptions, the January 3, 2019 report of the Special Master (the "Master's Report"), and the arguments of counsel at the hearings on August 22, 2018 (the "August 22 Hearing") and December 19, 2018 (the "December 19 Hearing") on the Motions, the Court, in the exercise of its discretion and for good cause shown, hereby rules upon the Motions and the Exceptions as set forth below.

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Charles E. Coble, Robert J. King III, Benjamin R. Norman, Jeffrey E. Oleynik, and Andrew L. Rodenbough, and Keogh Cox & Wilson, Ltd., by Richard W. Wolff, John P. Wolff, III, and Virginia J. McLin, for Plaintiffs Window World of Baton Rouge, LLC, Window World of Dallas, LLC, Window World of Tri State Area LLC, James W. Roland, Window World of St. Louis, Inc., Window World of Kansas City, Inc., Window World of Springfield/Peoria, Inc., James T. Lomax III, Jonathan Gillette, B&E Investors, Inc., Window World of North Atlanta, Inc., Window World of Central Alabama, Inc., Michael Edwards, Melissa Edwards, Window World of Central PA, LLC, Angell P. Wesnerford, Kenneth R. Ford, Jr., World of Windows of Denver, LLC, Rick D. Rose, Christina M. Rose, Window World of Rockford, Inc., Window World of Joliet, Inc., Scott A. Williamson, Jennifer L. Williamson, Brian C. Hopkins, Window World of Lexington, Inc., Tommy R. Jones, Jeremy T. Shumate, Window World of Phoenix LLC, James Ballard, and Toni Ballard.*

*Laffey, Leitner & Goode LLC, by Mark M. Leitner, Joseph S. Goode, Jessica L. Farley, Sarah E. Thomas Pagels, and John W. Halpin, and Manning, Fulton & Skinner, P.A., by Michael T. Medford, Judson A. Welborn, Natalie M. Rice, and Jessica B. Vickers, for Defendants Window World, Inc. and Window World International, LLC.*

*Bell, Davis & Pitt, P.A., by Andrew A. Freeman and Alan M. Ruley, for Defendant Tammy Whitworth.*

*Wilson Ratledge, PLLC, by Reginald B. Gillespie, Jr., for non-party Anna Elizabeth Vannoy.*

Bledsoe, Chief Judge.

I.

FINDINGS OF FACT[2]

3.    WW is in the business of selling and installing windows, doors, and siding. It operates several store locations and also franchises its business around the country. Plaintiffs in these actions are various Window World franchisees and franchisee owners. Plaintiffs allege, among other things, that WW (i) intentionally withheld information that Plaintiffs were entitled to receive under the Federal Trade Commission's ("FTC") Franchise Disclosure Rule, *see* 16 C.F.R. § 436.2, (ii) required Plaintiffs to execute "license agreements" that purportedly concealed and disclaimed the franchise relationships between WW and Plaintiffs, and (iii) misrepresented pricing and rebate information concerning purchases from suppliers, including Associated Materials, Inc. ("AMI").

4.    At issue in Plaintiffs' Privilege Motions are various documents that WW

---

[2] The procedural and factual background of these actions is set out more fully in *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2019 NCBC LEXIS 11 (N.C. Super. Ct. Feb. 11, 2019), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2019 NCBC LEXIS 7 (N.C. Super. Ct. Jan. 25, 2019), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 218 (N.C. Super. Ct. Dec. 19, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 102 (N.C. Super. Ct. Sept. 28, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 100 (N.C. Super. Ct. Sept. 26, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 79 (N.C. Super. Ct. Aug. 2, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 59 (N.C. Super. Ct. June 19, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60 (N.C. Super. Ct. July 12, 2017), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2016 NCBC LEXIS 82 (N.C. Super. Ct. Oct. 25, 2016), and *Window World of St. Louis, Inc. v. Window World, Inc.*, 2015 NCBC LEXIS 79 (N.C. Super. Ct. Aug. 10, 2015).

claims are protected by the attorney-client privilege and/or work-product immunity doctrine. Specifically, through the Motion to Compel, Plaintiffs seek to compel from WW certain documents that Plaintiffs contend WW improperly withheld on the basis of privilege and request that the Court impose sanctions for WW's improper privilege assertions. Through the Waiver Motion, Plaintiffs seek an order finding that WW waived the attorney-client privilege and the protections of work-product immunity as to all documents generated before November 1, 2011 that generally relate to WW's contemplated compliance with state and federal franchise laws. Plaintiffs assert that two grounds exist for finding WW waived any privilege or protection applicable to these documents: (i) WW's voluntary production of certain 2011 WW Board minutes and (ii) the crime-fraud exception to the attorney client privilege. In addition to their subject matter waiver arguments, Plaintiffs also contend that WW waived privilege as to certain documents based on WW's two-year delay in initiating a claw-back of those documents. The Court heard arguments on the Privilege Motions at the August 22 Hearing, at which all parties and non-party Anna Elizabeth "Beth" Vannoy ("Ms. Vannoy") were represented by counsel.

5. By Order and Opinion dated September 28, 2018 (the "*In Camera* Review Order"), the Court, in the exercise of its discretion and for good cause shown, concluded that an *in camera* review of certain documents was necessary to assess the propriety of WW's claims of privilege and to assist the Court in resolving the Privilege Motions. *See Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 102, at *14–15 (N.C. Super. Ct. Sept. 28, 2018). With the consent of the

parties, the Court appointed the Honorable W. David Lee ("Judge Lee," the "Special Master," or "Master") to conduct the *in camera* review by order dated October 12, 2018. Based on that review, Judge Lee submitted his Master's Report on January 3, 2019.

6. Through the parties' respective Exceptions, each brought pursuant to Rule 53(g) of the North Carolina Rules of Civil Procedure, WW and Plaintiffs separately take exception to certain findings and conclusions set forth in the Master's Report. After full briefing, the parties stipulated to a waiver of any hearing rights under Rule 53 through a joint letter to the Court dated March 18, 2019. After consideration of the parties' briefing and submissions in connection with the Exceptions, the Court concludes, in the exercise of its discretion, that a hearing will not assist the Court in resolving the Exceptions. The Court therefore rules on the Exceptions without a hearing as permitted by Business Court Rule ("BCR") 7.4.

7. Finally, through the Motion to Strike, WW requests that the Court strike and/or decline to consider portions of the affidavit of WW's former employee, Sean Gallagher ("Gallagher"), which Plaintiffs submitted as an exhibit in support of their Waiver Motion (the "Gallagher Affidavit"). The Court heard arguments on the Motion to Strike at the December 19 Hearing, at which all parties were represented by counsel.

8. The Motions and the Exceptions are now ripe for resolution.

A.    Relevant Factual Background

9.    As early as 1998, WW entered into contracts titled "franchise agreements" with various store owners. (*See* Pls.' Br. Supp. Waiver Mot. Ex. A, at 1–25, ECF No. 447.2.)[3] Beginning in the early 2000s, however, WW began titling its contracts with store owners, including Plaintiffs, as "licensing agreements." According to Plaintiffs, by no later than May 2010, WW knew that its business relationships with these store owners, including Plaintiffs, were properly characterized as franchisor-franchisee relationships under applicable federal law.[4] Plaintiffs argue that despite this knowledge, WW presented at least seventeen contracts to Plaintiffs between May 2010 and May 2011 that were titled "licensing agreements," each of which expressly and fraudulently disclaimed the existence of a franchisor-franchisee relationship

---

[3]  For ease of reference, all ECF citations in this Order and Opinion are to the Court's e-docket in 15 CVS 1.

[4]  For purposes of the federal regulations at issue here, a "franchise" is defined as "any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing," that:

(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

16 C.F.R. § 436.1(h).

with Plaintiffs. (*See* Pls.' Br. Supp. Waiver Mot. Ex. G, at 64–66, ECF No. 447.8.) Plaintiffs further contend that WW knowingly and intentionally violated the FTC's Franchise Disclosure Rule[5] by failing to provide to Plaintiffs the required Franchise Disclosure Documents ("FDDs"). According to Plaintiffs, WW used its in-house counsel, Ms. Vannoy, to perpetrate these alleged frauds.

10. Ms. Vannoy was hired as WW's in-house counsel in June 2010, (B. Vannoy Dep. 25:22–26:5, ECF No. 447.10), within a month of when Plaintiffs claim WW knew it was operating franchisor-franchisee relationships with Plaintiffs. Ms. Vannoy had previously worked as an attorney at WW's primary outside law firm, Vannoy, Colvard, Triplett & Vannoy, since 2008. Shortly after she began working in-house at WW, Ms. Vannoy went on maternity leave from July 2010 through October 2010. (B. Vannoy Dep. 202:8–15.)

11. According to Ms. Vannoy, at some point around May 2010, while she was working at her former law firm, she began conducting "due diligence to learn what [she] could about franchise systems to prepare [her] to meet with" a franchising attorney concerning WW. (B. Vannoy Dep. 136:23–139:16; *see* B. Vannoy Dep. 140:11–13 ("Q. Why were you doing the due diligence? A. It was suggested to me that

---

[5] The Franchise Disclosure Rule provides that, "[i]n connection with the offer or sale of a franchise," a franchisor must "furnish a prospective franchisee with a copy of the franchisor's current disclosure document . . . at least 14 calendar-days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor or an affiliate in connection with the proposed franchise sale." 16 C.F.R. § 436.2(a). The Rule further provides that at least seven calendar-days before "alter[ing] unilaterally and materially the terms and conditions of the basic franchise agreement or any related agreements attached" to the FDD, a franchisor must "furnish[] the prospective franchisee with a copy of each revised agreement[.]" *Id.* § 436.2(b).

I look into it at some point."), 141:1–7 ("[Q.] Who suggested that? A. Jay Vannoy.").) As part of those preparations, Ms. Vannoy avers that she "started gathering information based on what [she] had learned would go into" an FDD. (B. Vannoy Dep. 124:21–23, 125:16–23. *But see* B. Vannoy Dep. 127:10–15.)

12. Over a year later, in June 2011, Ms. Vannoy and her husband, John "Jay" Vannoy ("Mr. Vannoy"), WW's outside counsel and a member of WW's Board of Directors (the "WW Board"), met with Ritchie Taylor ("Taylor"), an attorney with Manning, Fulton & Skinner, P.A. in Raleigh with significant experience in franchising issues, to obtain legal advice concerning WW's obligations under franchise laws. (B. Vannoy Dep. 82:14–16.) Ms. Vannoy avers that, before meeting with Taylor, WW did not know whether federal franchise law applied to WW's business relationships with its store owners, including Plaintiffs. (B. Vannoy Dep. 226:9–24; *see* J. Vannoy Dep. 94:9–14, ECF No. 483.7; McBride[6] Dep. 133:5–14, ECF No. 483.5.)

13. Ms. Vannoy and others at WW aver that after meeting with Taylor, WW decided to convert from a licensing system to a franchise system and that the conversion was accomplished in the fall of 2011. (B. Vannoy Dep. 179:3–181:12; J. Vannoy Dep. 71:1–7, 122:23–123:5; McBride Dep. 291:25–292:6; Whitworth[7] Dep. 251:1–7, ECF No. 483.8. *But cf.* B. Vannoy Dep. 105:8–16 ("Q. [W]as there a change

---

[6] James "Jamie" McBride ("McBride") is a member of the WW Board.

[7] Defendant Tammy Whitworth ("Whitworth") is WW's Chief Executive Officer and Board Chair.

in the way business was done that caused [WW] to become a franchise system? . . . .
A. And once again, I'll just say I don't know.  As I sit here today, I don't know.").)

14.    In October 2011, WW sent letters to Plaintiffs and the other store owners operating under purported licensing agreements acknowledging that WW had "failed to comply with Federal and State Laws" by not presenting the store owners with an FDD prior to their purchase of a WW "license" (i.e., franchise).  (Pls.' Br. Supp. Waiver Mot. Ex. K, ECF No. 447.12.)  It is undisputed that WW did not provide an FDD to any Plaintiff until October 2011.  (*Cf.* Wellborn Aff. Supp. WW's Mot. Recons. Ex. R, ECF No. 621.18.)

B.    WW's Conduct in Discovery

15.    In April 2016, several months after the parties began rolling document productions, WW claims it learned that a large number of documents WW had previously produced to Plaintiffs in discovery were inadvertently and inappropriately coded as not confidential, privileged, or eligible for redactions based on privilege.  (Goode Aff. ¶ 20, ECF No. 577.)  As a result, on April 28, 2016, WW's counsel informed Plaintiffs' counsel via telephone that WW intended to invoke the claw-back provision of the Court's July 31, 2015 Protective Order to claim privilege on these documents.[8]

---

[8] The claw-back provision of the Protective Order provides, in relevant part, as follows:

> If a Document containing information subject to the Attorney-Client Privilege or Work Product Doctrine . . . is inadvertently disclosed, the inadvertent disclosure shall not constitute a waiver by a Party . . . of the Attorney-Client Privilege or Work Product Doctrine . . . .  Upon notification by a Party . . . to the person to whom the Document was inadvertently disclosed, either (a) the person must immediately return it, including any copies, and shall destroy any notes or work product concerning the Document and the information therein; or (b) if the person to whom the Document was inadvertently disclosed disagrees with the claim or privilege . . .,

(Goode Aff. ¶ 22; *see* Protective Order 6, ECF No. 68.) The next day, WW's counsel served a letter on Plaintiffs' counsel indicating that WW was clawing back 320 previously produced documents (the "2016 Claw-back"). (Goode Aff. ¶ 23.) Two weeks later, on May 11, 2016, WW relinquished its claim of privilege on 50 of the 320 documents identified in the 2016 Claw-back, leaving 270 documents subject to the claw-back. (Goode Aff. ¶ 26.)

16.     WW contends that after the 2016 Claw-back, WW's counsel investigated the scope of the inadvertent disclosure leading to the claw-back and established a secondary review process (the "Secondary Review") to re-review all documents previously reviewed by the outside attorney WW contends inappropriately coded the documents subject to the 2016 Claw-back. (Goode Aff. ¶ 24.) According to WW, on May 11, 2016, WW's counsel completed the Secondary Review and determined that an additional 375 documents should be clawed-back, and that 48 other documents should be subjected to a third-pass review. (Goode Aff. ¶ 27.) WW contends, however, that its counsel "inadvertently failed to pull the documents flagged by May 11, 2016 into a third-pass review set" due to "numerous time-sensitive tasks, motion practice, and discovery deadlines[.]" (Goode Aff. ¶ 28.)

17.     Nearly two years later, in the course of preparing for the April 19, 2018 deposition of Ms. Vannoy, WW's counsel "noticed that a number of documents in the binder prepared for counsel's deposition-preparation session with Ms. Vannoy

that person must not use the Document and the information therein until allowed to do so by an Order of the Court.

(Protective Order 6.)

appeared to be privileged communications[.]" (Goode Aff. ¶ 43.) WW's counsel asserts that WW "concluded that 24 documents in the binder were inadvertently produced and should have been clawed back . . . and identified [an additional] 4 documents that required partial claw back." (Goode Aff. ¶ 45.) WW further contends that, on April 9, 2018, WW's counsel "discovered for the first time that more than 400 documents from the 2016 Secondary Review had been marked as needing claw-back . . . in May of 2016, but had not yet been clawed back." (Goode Aff. ¶ 46.)

18.     On April 13, 2018, without advance notice to Plaintiffs and just days before Ms. Vannoy's deposition, WW's counsel sent Plaintiffs' counsel a second claw-back letter identifying 336 documents that WW contended had been "inadvertently produced" and now required claw-back (the "2018 Claw-back"). (Goode Aff. ¶ 48; *see* Pls.' Resp. Goode Aff. 5, ECF No. 583.) While WW contends that the 2018 Claw-back "was the result of a realization on April 9, 2018 that the 2016 [C]law-back had not been fully completed," (Goode Aff. ¶ 66), the 2018 Claw-back included at least 50 documents that were not produced until after the 2016 Claw-back had been initiated, (Pls.' Resp. Goode Aff. 2–3; *see* Pls.' Br. Supp. Mot. Compel 5, ECF No. 449). Thus, together with the 320 documents sought in the 2016 Claw-back, WW initiated claw-back to a remarkable 656 documents that it previously had produced. In response to numerous objections by Plaintiffs, WW ultimately relinquished its claim of privilege and released—in full or with redactions—a significant number of the 2018 Claw-back documents on April 17, May 18, and June 27, 2018.[9] (Goode Aff. ¶¶ 52, 57, 59, 64.)

---

[9]   As discussed *infra*, WW has offered conflicting accounts as to the exact number of documents actually released from the 2018 Claw-back.

19. As required by the Case Management Order (the "CMO"), WW logged documents that it withheld in whole or in part on either a privilege log or a privilege redaction log (together, the "Logs").[10] As early as February 2017, WW acknowledged to Plaintiffs that its Logs were incomplete. (Pls.' Br. Supp. Mot. Compel Ex. G, ECF No. 449.8.) Although WW committed to providing Plaintiffs with updated Logs by June 30, 2017, (Goode Aff. ¶ 40), WW did not provide updated Logs until April 13, 2018 (the "2018 Logs")—the same day as the 2018 Claw-back, (Goode Aff. ¶ 41). WW's counsel attributes the fourteen-month delay to the "extensive work in this litigation." (Goode Aff. ¶ 40.)

20. WW's 2018 Logs contain numerous document descriptions that are materially different from the descriptions included in prior Logs. The document descriptions in the 2018 Logs contain considerably less detail than prior versions, and Plaintiffs argue that many descriptions were "suspiciously altered." (Pls.' Resp. Goode Aff. 12.) In particular, although WW's earlier Logs from February 2017 (the "2017 Logs") included document descriptions referencing franchise disclosures as early as May 2010, (*see* Pls.' Br. Supp. Mot. Compel Exs. D, F, ECF Nos. 449.5, 449.7), WW revised the 2018 Logs to omit all pre-October 2011 references to franchising.

C. *In Camera* Review

21. Through the Motion to Compel, Plaintiffs requested, among other things, that the Court or a special master conduct an *in camera* review of (i) 280 documents

---

[10] WW served its initial privilege log on September 25, 2015 and served revised or supplemental Logs on November 17, 2015, July 29, 2016, January 13, 2017, February 14, 2017, and April 13, 2018. (Goode Aff. ¶¶ 33–41.)

that were included in the 2018 Claw-back for which Plaintiffs challenge WW's assertion of privilege (the "Challenged Claw-back Documents" or "CCDs") and (ii) all documents identified on WW's 2018 Logs (a total of approximately 1,500 documents). As reflected in the *In Camera* Review Order, the Court concluded that an *in camera* review of certain documents was necessary to assess the propriety of WW's claims of privilege and to assist the Court in resolving the Privilege Motions. *See Window World of Baton Rouge, LLC*, 2018 NCBC LEXIS 102, at \*14–15. Specifically, the Court ordered the Master to conduct an *in camera* review of (i) the 280 Challenged Claw-back Documents and (ii) approximately 10% of the documents identified in WW's 2018 Logs (the "Sample Log Documents" or "SLDs" and, together with the Challenged Claw-back Documents, the "Review Documents"). *Id.* at \*19–20. The Court deferred ruling on the Privilege Motions pending the results of the *in camera* review.

22. Consistent with the *In Camera* Review Order, the parties submitted for the Special Master's consideration a Joint Factual Background Statement (the "Joint Factual Background"), which included competing Statements of Additional Material

Facts. (*See* Joint Factual Background Statement [hereinafter "JFB"].)[11]  WW also tendered electronic and hard copies of the Review Documents to the Special Master.[12]

23.   After conducting his review, Judge Lee submitted his Special Master's Report on January 3, 2019.   The Report set forth the Master's findings and conclusions as to (i) the propriety of WW's claim of privilege for each Review Document and (ii) the accuracy and adequacy of the document descriptions in WW's 2018 Logs for each Sample Log Document.  (*See* Special Master's Report [hereinafter "Master's Rpt."], ECF No. 684.)

24.   As to the Challenged Claw-back Documents, the Special Master concluded as follows:

> The undersigned has determined that **one hundred sixty-six (166)** of the [280 Challenged Claw-back Documents] may properly be considered **privileged**.  The undersigned has further determined that **eighty-seven (87)** of the [280 Challenged Claw-back Documents] are **not privileged**.  Of the [280 Challenged Claw-back Documents] there were an additional **twenty-five (25) Documents** wherein each "document" consisted of multiple communications, usually in the form of emails, **involving non-privileged third party communications as well as privileged attorney-client communications**. . . .

---

[11]  The parties also submitted for the Special Master's consideration copies of the 2018 Logs, (JFB Exs. 4, 7); a list of key persons, (JFB Ex. 2); a list of the Challenged Claw-back Documents which indicated when certain documents were relinquished from the 2018 Claw-back, (JFB Ex. 3); a list of litigation matters involving WW, (JFB Ex. 5); and a list of the Sample Log Documents, (JFB Ex. 6).  The Joint Factual Background and other *in camera* review materials have not been filed on the Court's dockets but have been retained and can be made a part of the court record in the event of an appeal.

[12]  WW tendered the Review Documents to the Master in "families," meaning that e-mail attachments were submitted with the corresponding e-mails to which they were attached and vice versa.  As to Review Documents that WW produced to Plaintiffs in part (i.e., with redactions), WW included a watermarked redaction box identifying the redacted portion.  For some of the electronic versions of the Review Documents, the watermark box made the covered text (i.e., the redacted text) difficult, but not impossible, to read.

There were two (2) [Challenged Claw-back Documents] as to which attorney work product was asserted. The undersigned determined **one Document was protected by the work product doctrine** and **the other Document was not protected by that doctrine.**

[T]he undersigned also assessed the nature of the **thirty-six (36) [Challenged Claw-back Documents]** wherein it is noted that the privilege claim has been **relinquished**. The undersigned determined that **thirty (30)** of these Documents **were not privileged**.[13]

(Master's Rpt. 5.)

25. As to the Sample Log Documents, the Special Master concluded as follows:

The undersigned has determined that **seventy-six (76)** of the [150 Sample Log Documents] are **privileged**. The undersigned has further determined that **forty-six (46)** of the [150 Sample Log Documents] are **not privileged**. The remaining **twenty-eight (28)** [Sample Log Documents] include "documents" containing **multiple communications**, a portion of which are not privileged and a portion of which may properly be considered to be privileged.[14]

(Master's Rpt. 21.)

---

[13] In WW's Statement of Additional Material Facts, WW suggested that, while WW was providing all 280 Challenged Claw-back Documents for *in camera* review, it had decided to relinquish its privilege claim to 51 of the Challenged Claw-back Documents and that therefore the Special Master "should only review privilege determinations for the 229 remaining documents." (JFB 8.) Not only does this misrepresent the number of Challenged Claw-back Documents that WW actually released (i.e., 36, not 51), WW's attempt to unilaterally limit the scope of the *in camera* review is contrary to the plain text of the *In Camera* Review Order. *See Window World of Baton Rouge, LLC*, 2018 NCBC LEXIS 102, at *10, *14.

[14] Of the twenty-eight Sample Log Documents involving multiple communications, the Court has concluded that sixteen were properly redacted so as to omit only the privileged communications. Specifically, the Court finds that WW properly redacted Sample Log Document Nos. 76, 89, 97, 98, 102, 114, 115, 125, 134, 138, 139, 140, 144, 148, 149, and 150, and these documents are no longer at issue. The Court finds otherwise as to the other twelve Sample Log Documents involving multiple communications (Nos. 2, 88, 91, 110, 111, 113, 121, 126, 127, 128, 136, and 137), as will be explained in more detail below.

26.    The Special Master also made findings concerning the accuracy and adequacy of WW's document descriptions for the Sample Log Documents in the 2018 Logs, concluding as follows:

> The undersigned has determined that **seventy-four (74)** of the [150 Sample Log Document] descriptions are **accurate**, and that **seventy-six (76)** of the [150 Sample Log Document] descriptions are **inaccurate**.
>
> [T]he email descriptions overwhelming[ly] utilize catch phrases such as "regarding legal advice" or "relating to legal compliance" without reference to the specific subject of the email.  The undersigned has determined that no less than **ninety-five (95)** of the [150 Log entries associated with the Sample Log Documents] describe an email or draft as either regarding or relating to **"legal advice."** (Presumably, all [150 Sample Log Documents] are regarding or relating to legal advice.)  Such a description provides no enlightenment and renders the entry wholly inadequate in affording an adverse party a fair opportunity to assess the validity of the privilege claim.  Moreover, at least **thirty (30)** of the [150 Sample Log Documents] merely describe the document as a **"draft."**  Such a description likewise fails to identify the subject matter of the communication sufficient to demonstrate why the privilege applies.
>
> The undersigned has determined that only **four (4)** of the [150 Sample Log Document] descriptions provide sufficient detail of the subject matter of the Document to arguably permit an assessment as to why the privilege applies.

(Master's Rpt. 21.)

27.    After reviewing the Master's Report and carefully examining the Sample Log Documents that the Master identified either as not privileged or as containing non-privileged communications, the Court determined, by order dated January 17, 2019 (the "January 17 Order"), that WW should have an opportunity to present argument and evidence, on a sealed and *ex parte* basis, concerning its assertion of privilege as to forty-two specifically identified Sample Log Documents the Special

Master had determined were inappropriately withheld from production (the "Identified Sample Log Documents").[15]

28.     By letter to the Court dated January 18, 2019, WW requested that the Court allow WW to file exceptions to the Master's Report pursuant to Rule 53(g). The Court held a telephone conference with counsel for all parties on January 23, 2019 to address the issues raised in WW's January 18, 2019 letter. By Order dated January 24, 2019, the Court concluded that the January 17 Order should be modified, and the Court authorized WW to submit a brief and supporting materials setting forth its position as to the forty-two Identified Sample Log Documents (the "Sample Log Submission") and to permit both WW and Plaintiffs to submit exceptions to the Master's Report.

29.     WW submitted its Sample Log Submission on February 11, 2019. (*See* WW's Br. Sample Docs., ECF No. 692.) WW's Rule 53(g) Exceptions, which incorporate WW's Sample Log Submission by reference, also were submitted on February 11,

---

[15] The Identified Sample Log Documents included Sample Log Document Nos. 5; 11; 12; 19 as to the March 15, 2012 Notice of Electronic Filing; 29; 30; 31; 32; 36; 40; 42 as to Deem's November 7, 2013 e-mail and McBride's November 7, 2013 e-mail; 43; 45; 53; 59; 60; 61; 62; 63 as to Ms. Vannoy's November 5, 2014 e-mail to Taylor; 65; 69; 72; 80 as to Taylor's October 18, 2011 e-mail to Ms. Vannoy; 83; 84 as to Ms. Vannoy's November 9, 2011 e-mail to Mr. Vannoy and Deem's November 9, 2011 e-mail to Ms. Vannoy; 87 as to Deem's November 23, 2011 e-mail to Ms. Vannoy; 109 as to Ms. Vannoy's March 25, 2013 e-mail to Taylor and Mathis's e-mail to Ms. Vannoy; 110 as to Deem's March 16, 2013 e-mail to Ms. Vannoy; 111 as to Deem's April 17, 2013 e-mail to Ms. Vannoy; 113 as to Ms. Vannoy's May 15, 2013 e-mail to Deem; 122 as to Ms. Vannoy's August 12, 2013 e-mail to Taylor and Deem's August 12, 2013 e-mail; 126; 127 as to Ms. Vannoy's January 6, 2014 e-mail to Taylor and Deem's January 6, 2014 e-mail to Ms. Vannoy; 128 as to Mr. Vannoy's February 26, 2014 e-mail; 130; 133 as to Ms. Vannoy's April 24, 2014 e-mail to Mathis and Taylor's April 24, 2014 e-mail to Ms. Vannoy; 135 as to Deem's June 2, 2014 e-mail to Ms. Vannoy; 136 as to Ms. Vannoy's July 23, 2014 e-mail; 137; 142 as to Taylor's November 6, 2014 e-mail to Ms. Vannoy; 143; and 146 as to McBride's February 18, 2015 e-mail and Whitworth's February 18, 2015 e-mail.

2019. (*See* WW's Rule 53(g) Exceptions Report Special Master [hereinafter "WW's Exceptions"], ECF No. 697.) WW specifically takes exception to the Master's privilege determinations as to (i) the forty-two Identified Sample Log Documents; (ii) sixteen additional Sample Log Documents;[16] and (iii) fifty-six Challenged Claw-back Documents.[17] WW also asserts a general exception to the Master's conclusions that the Sample Log Document descriptions in the 2018 Logs were inaccurate and/or inadequate.

30. Plaintiffs filed their Rule 53(g) Exceptions on February 11, 2019. (*See* Pls.' Exceptions Special Master's Report [hereinafter "Pls.' Exceptions"], ECF No. 690.) Plaintiffs contest the Master's rulings on seventy-three Challenged Claw-back Documents.[18]

---

[16] WW takes exception to the Master's rulings on the following sixteen additional Sample Log Documents: 2, 3, 4, 6, 9, 16, 17, 35, 88, 91, 93, 104, 117, 119, 121, and 147.

[17] WW excepts to the Master's rulings on the following fifty-six Challenged Claw-back Documents: 4, 5, 6, 20, 22, 32, 33, 35, 49, 51, 109, 133, 142, 144, 147, 149, 150, 155, 158, 161, 165, 167, 168, 169, 186, 187, 201, 204, 205, 214, 216, 219, 220, 221, 227, 229, 231, 239, 246, 247, 248, 249, 250, 252, 254, 255, 257, 259, 260, 261, 269, 276, 277, 278, 279, and 280. Although WW initially took exception to the Master's ruling as to Challenged Claw-back Document No. 281, WW later relinquished its claim of privilege and withdrew its exception to that document. (WW's Notice Withdrawal Exceptions & Privilege Claims Challenged Document No. 281, ECF No. 707.)

[18] Plaintiffs take exception to the Master's findings that the following seventy-three Challenged Claw-back Documents are privileged: 9, 11, 12, 13, 14, 15, 23, 42, 43, 46, 47, 48, 50, 52, 54, 61, 62, 65, 79, 80, 81, 87, 90, 95, 101, 102, 106, 107, 108, 111, 112, 116, 118, 119, 131, 146, 148, 156, 157, 160, 162, 163, 164, 176, 177, 189, 191, 195, 197, 198, 200, 206, 207, 208, 209, 210, 211, 218, 222, 223, 226, 230, 232, 233, 238, 240, 241, 242, 243, 244, 258, 260, and 270. Because Plaintiffs do not have access to the Sample Log Documents, they are unable to take exception to the Master's findings as to any of those documents.

31. WW has withdrawn its claim of privilege to a number of the Review Documents. As noted previously, WW relinquished its privilege claim to 36 of the 280 Challenged Claw-back Documents prior to the *in camera* review.[19] Moreover, in a footnote to WW's Exceptions, WW indicated that it "will agree to produce" seven additional Challenged Claw-back Documents and one Sample Log Document.[20] (WW's Exceptions 6 n.8.) In addition, on April 15, 2019, WW relinquished its privilege claim as to Challenged Claw-back Document No. 281. (WW's Notice Withdrawal Exceptions & Privilege Claims Challenged Document No. 281, ECF No. 707.) Thus, as of the date of this Order and Opinion, WW has relinquished its claim of privilege as to forty-four Challenged Claw-back Documents and one Sample Log Document.

---

[19] Prior to the *in camera* review, WW relinquished its claim of privilege as to Challenged Claw-back Document Nos. 1, 8, 19, 21, 28, 30, 36, 37, 39, 42, 58, 59, 70, 71, 72, 74, 75, 76, 85, 88, 89, 91, 92, 93, 97, 134, 175, 245, 256, 262, 266, 268, 271, 272, 273, and 275. WW previously offered conflicting accounts concerning the number of Challenged Claw-back Documents actually released. (*See* Pls.' Resp. Goode Aff. 10 n.8; Pls.' Resp. WW's Exceptions 3 n.2.) First, WW represented to the Court—through counsel's sworn testimony—that, as of the August 22 Hearing, WW had released 90 of the 280 Challenged Claw-back Documents (76 in full and 14 in part). (*See* Goode Aff. ¶ 64.) Next, WW represented to the Master that "[i]n preparing the [Challenged Claw-back Documents] for review, WW's counsel determined that 51 documents . . . do not require a ruling because WW is no longer claiming its privilege over them." (JFB 8.) Of the 280 Challenged Claw-back Documents that WW actually submitted for the *in camera* review, however, only 36 were marked as "RELINQUISHED." (*See* JFB Ex. 3.) Indeed, contrary to its earlier representations, WW conceded in a footnote to its Exceptions that only 36 Challenged Claw-back Documents were released prior to the *in camera* review. (WW's Exceptions 4 n.3.)

[20] Through WW's Exceptions, WW relinquished its claim of privilege as to Sample Log Document No. 65 and Challenged Claw-back Document Nos. 10, 66, 73, 77, 122, 123, and 127. (WW's Exceptions 6 n.8.)

## II.

## CONCLUSIONS OF LAW

A.  Attorney-Client Privilege and Work-Product Immunity

32.  "The attorney-client privilege is well-grounded in the jurisprudence of this State" and is "based upon the belief that only 'full and frank' communications between attorney and client allow the attorney to provide the best counsel to his client." *In re Investigation of the Death of Miller*, 357 N.C. 316, 328–29, 584 S.E.2d 772, 782 (2003) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  Our Supreme Court has set forth a five-part test to determine whether a particular communication is protected by the attorney-client privilege:

> (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*Id.* at 335, 584 S.E.2d at 786 (quoting *State v. McIntosh*, 336 N.C. 517, 523–24, 444 S.E.2d 438, 442 (1994)).  "If any one of these five elements is not present in any portion of an attorney-client communication, that portion of the communication is not privileged." *Id.*  While "[t]he burden is always on the party asserting the privilege to demonstrate each of its essential elements," the "responsibility of determining whether the attorney-client privilege applies belongs to the trial court, not to the attorney asserting the privilege." *Id.* at 336, 584 S.E.2d at 787–88; *cf. Evans v. United Servs. Auto. Ass'n*, 142 N.C. App. 18, 31, 541 S.E.2d 782, 790 (2001) ("[C]ourts are

obligated to strictly construe the privilege and limit it to the purpose for which it exists.").

33. In contrast to the attorney-client privilege, the work-product immunity doctrine protects from discovery only materials "prepared in anticipation of litigation." *Sessions v. Sloane*, 248 N.C. App. 370, 383, 789 S.E.2d 844, 855 (2016). "Materials prepared in the regular course of business are, however, not protected." *Id.* In order to determine whether a document was prepared in anticipation of litigation or in the regular course of business, our courts consider:

> whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

*Id.* (quoting *Cook v. Wake Cty. Hosp. Sys., Inc.*, 125 N.C. App. 618, 624, 482 S.E.2d 546, 551 (1997)). " 'Because work product protection by its nature may hinder an investigation into the true facts, it should be narrowly construed consistent with its purpose[,]' which is to 'safeguard the lawyer's work in developing his client's case.' " *Evans*, 142 N.C. App. at 29, 541 S.E.2d at 789 (quoting *Suggs v. Whitaker*, 152 F.R.D. 501, 505 (M.D.N.C. 1993)). At the same time, however, the protections of the work product immunity may apply even absent "the direct involvement of an attorney[.]" *Sessions*, 248 N.C. App. at 384, 789 S.E.2d at 855.

B. <u>Waiver Motion</u>

34. Through the Waiver Motion, Plaintiffs seek an order ruling that WW waived the protections of the attorney-client privilege and work-product immunity as to all

documents generated prior to November 1, 2011 that generally relate to WW's compliance with federal or state franchise laws, including, among other things, (i) WW's "efforts to determine whether WW was subject to . . . franchise laws," (ii) the "drafting and contents" of all licensing agreements and franchise agreements, and (iii) the "drafting and contents of any [FDD], including the collection, compiling, creation, and gather[ing] of any information for inclusion or possible inclusion" in an FDD.[21] (Pls.' Waiver Mot. 1–2, ECF No. 446.) Plaintiffs argue that WW waived privilege as to franchise law compliance issues by voluntarily producing certain attorney-client communications related to this topic and by operation of the crime-fraud exception. Separate from their subject matter waiver arguments, Plaintiffs also contend that WW waived privilege as to all of the Challenged Claw-back Documents based on WW's two-year delay in initiating the 2018 Claw-back. The Court will address each of Plaintiffs' arguments.

### 1. Waiver by Disclosure

35. Plaintiffs argue that WW waived the protections of the attorney-client privilege and work-product immunity doctrine by producing certain privileged documents. Plaintiffs specifically contend that WW waived privilege (i) as to all documents related to franchising issues by voluntarily and selectively disclosing certain privileged communications concerning those subjects and (ii) as to the

---

[21] In addition to their request for a privilege waiver as to franchise issues, Plaintiffs seek an order (i) precluding WW from instructing witnesses not to answer questions relating to franchise issues on privilege grounds and (ii) requiring Ms. Vannoy to submit to a second deposition and provide full and complete testimony on this topic. Plaintiffs also ask that the Court or a special master review *in camera* all documents identified on WW's 2018 Logs to determine whether the documents fall within scope of the alleged subject matter waiver.

Challenged Claw-back Documents by failing to claw back those documents for nearly two years.

36. "Generally, communications between an attorney and client are not privileged if made in the presence of a third party because those communications are not confidential and because that person's presence constitutes a waiver." *Berens v. Berens*, 247 N.C. App. 12, 20, 785 S.E.2d 733, 740 (2016). "The attorney-client privilege can be waived by either intentional disclosure or inadvertent disclosure. In either case, a finding of waiver depends on the particular circumstances surrounding the disclosure." *Blythe v. Bell*, 2012 NCBC LEXIS 44, at *21 (N.C. Super. Ct. July 26, 2012) (citations omitted).

a. Waiver as to Challenged Claw-back Documents

37. The Court first concludes that WW has waived any claim of privilege as to the 280 Challenged Claw-back Documents. While the Protective Order in these cases provides that a party's inadvertent disclosure of documents containing privileged information shall not constitute a waiver, (Protective Order 6), WW improperly seeks to use this provision as a sword to gain strategic advantage, which the Court will not allow.

38. Courts balance the following factors to determine whether inadvertent production of privileged materials waives the attorney-client privilege: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosures; (4) any delay in measures taken to rectify the disclosures; and (5) overriding interests in justice."

*Morris v. Scenera Research, LLC*, 2011 NCBC LEXIS 34, at \*28 (N.C. Super. Ct. Aug. 26, 2011) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 259 (D. Md. 2008)). "The reasonableness of the privilege holder in protecting and asserting the privilege is paramount to overcoming the consequences of an inadvertent waiver." *Id.* (quoting *Martin v. State Farm Mut. Auto. Ins. Co.*, No. 3:10-CV-0144, 2011 U.S. Dist. LEXIS 36058, at \*13 (S.D. W. Va. Apr. 1, 2011)).

39. While this Court has noted that "it is only necessary to turn to these factors if the parties have not reached agreement on procedures to be followed in the event of the production of privileged materials," *id.*, where, as here, a party utilizes a claw-back or non-waiver agreement to gain a strategic advantage or to make unfair use of a prior disclosure, privilege may nevertheless be waived, *cf. Johnson v. Oakland Univ.*, No. 15-12482, 2016 U.S. Dist. LEXIS 141049, at \*3 (E.D. Mich. Oct. 12, 2016) ("The Magistrate decided not to enforce the claw-back provision after analyzing the disclosure of the document under the five-step process from *Victor Stanley*, and the Court does not find this clearly erroneous or contrary to law."); *Crosmun v. Trs. of Fayetteville Tech. Cmty. Coll.*, No. COA18-1054, 2019 N.C. App. LEXIS 658, at \*40 n.17 (N.C. Ct. App. Aug. 6, 2019) (noting that claw-back and "quick peek" "agreements appear to be generally disfavored as the exclusive means of protecting privilege in most contexts").

40. Additionally, although North Carolina has not adopted an equivalent rule, the Court considers federal case law addressing waiver by disclosure under Federal Rule of Evidence 502 instructive on this matter. Rule 502(b) provides that

inadvertent disclosure in a federal proceeding does not operate as a waiver if "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." Fed. R. Evid. 502(b); *see also* Fed. R. Evid. 502(d) ("A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court[.]").

41.    Federal courts have adopted differing approaches when considering the extent to which a claw-back order or agreement displaces Rule 502(b). *Compare United States v. Wells Fargo Bank, N.A.*, No. 12-CV-7527 (JMF), 2015 U.S. Dist. LEXIS 113546, at *5 (S.D.N.Y. Aug. 26, 2015) ("[W]here parties have entered into a protective order that includes a non-waiver provision, as here, courts have found waiver only where the producing party acted in a 'completely reckless' manner with respect to its privilege."), *with Northrop Grumman Sys. Corp. v. United States*, 120 Fed. Cl. 436, 438 (2015) ("[T]he protective order's claw back provision is subject to the implicit requirements that the initial privilege review must have been reasonable and its assertion of the privilege timely[.]"), *with U.S. Home Corp. v. Settlers Crossing, LLC*, No. DKC 08-1863, 2012 U.S. Dist. LEXIS 101778, at *18 (D. Md. July 23, 2012) ("To find that a court order or agreement under Rule 502(d) or (e) supplants the default Rule 502(b) test, courts have required that concrete directives be included in the court order or agreement regarding *each* prong of Rule 502(b). In other words, if a court order or agreement does not provide adequate detail regarding what

constitutes inadvertence, what precautionary measures are required, and what the producing party's post-production responsibilities are to escape waiver, the court will default to Rule 502(b) to fill in the gaps[.]"), *and Tadayon v. Greyhound Lines, Inc.*, No. 10-1326 (ABJ/JMF), 2012 U.S. Dist. LEXIS 78288, at *4 (D.D.C. June 6, 2012) ("Since the right to clawback was not so conditioned, the agreement stands as written and defendant may recall the privileged documents, irrespective of whether or not its initial production was negligent.").

42. Here, paragraph 6 of the Protective Order provides that "[i]f a Document containing information subject to the Attorney-Client Privilege or Work Product Doctrine . . . is inadvertently disclosed, the inadvertent disclosure shall not constitute a waiver by a Party . . . of the Attorney-Client Privilege or Work Product Doctrine[.]" (Protective Order 6.) The provision does not address what constitutes inadvertent disclosure, what precautionary measures are required of a producing party, or the post-production responsibilities of the producing party.

43. Rather than permit a *carte blanche* invitation to negligent or bad faith production, the Court interprets its own Order to contain implicit requirements that a producing party's initial privilege review must have been reasonable and its assertion of privilege and claw-back must have been timely. *See Northrop Grumman Sys. Corp.*, 120 Fed. Cl. at 438; *Crosmun*, 2019 N.C. App. LEXIS 658, at *40 n.17 (noting that claw-back agreements "are best considered as an additional protective measure rather than the primary prophylactic"). The Court further concludes that waiver may be found notwithstanding an agreement or order to the contrary where,

as here, a producing party acts in a completely reckless manner with respect to its privilege. *See Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 113546, at *5.

44. WW's whipsaw pattern of producing documents, then later clawing back large numbers of those documents based on privilege, only to then again withdraw its assertions of privilege as to many of *those* clawed back documents—a pattern WW followed in 2016 and again in 2018—reflects a cavalier disregard for the rules of discovery and appears motivated more by WW's shifting theory of its defense rather than by genuine concerns over the proper assertion of privilege. The sheer volume of documents affected by WW's on-again, off-again privilege claims is remarkable, as is WW's extraordinary delay in initiating the 2018 Claw-back after becoming aware of its inadvertent production two years before. WW's conduct cannot be condoned. Indeed, numerous courts have refused to enforce far shorter claw-back delays than WW attempts here. *See, e.g., Skansgaard v. Bank of Am., N.A.*, No. C11-0988 RJB, 2013 U.S. Dist. LEXIS 48176, at *9 (W.D. Wash. Mar. 6, 2013) ("[C]ourts have emphasized that claw back requests should be made immediately, with delays of even a few weeks determined to be too long, much less nearly two months."); *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97-Civ.-6124 (JGK) (THK), 2000 U.S. Dist. LEXIS 7939, at *23 (S.D.N.Y. June 7, 2000) ("Although inordinate delay in claiming the privilege may result in a waiver, the length of delay in claiming the privilege should be measured from the time the producing party learns of the disclosure, not from the time of the disclosure itself."); *Apex Mun. Fund v. N-Group*

*Sec.*, 841 F. Supp. 1423, 1433 (S.D. Tex. 1993) ("Simply put, a one-year delay in taking any action to attempt to preserve the privilege exemplifies carelessness.").

45. As noted, the 2016 Claw-back involved 320 documents, (Goode Aff. ¶ 22), a total later reduced to 270 after WW released its privilege claim to 50 of those documents, (Goode Aff. ¶ 26). Then, after concluding in May 2016 that 375 additional documents should be clawed back and that 48 documents should be subjected to a third-pass review, (Goode Aff. ¶ 27), WW waited almost two years, until April 13, 2018—and only days before the depositions of key WW witnesses—to claw back 336 of these documents through the 2018 Claw-back. As had become its pattern, WW then withdrew its privilege claim, either in whole or in part, to 98 of these 336 documents—nearly 30% of the documents included in the 2018 Claw-back. Ninety-one of these ninety-eight documents, however, were only released after important WW witness depositions had been completed.[22]

46. While WW contends that the 2018 Claw-back "was the result of a realization . . . that the 2016 claw-back had not been fully completed," (Goode Aff. ¶ 66), the 2018 Claw-back included at least 50 documents that were not produced until after the 2016 Claw-back, (Pls.' Resp. Goode Aff. 2–3). Moreover, several of the 2018 Claw-back documents were previously introduced at depositions, including at least one document introduced by WW's own counsel. (Pls.' Resp. Goode Aff. 2–3.)

---

[22] It is worth noting that WW's related privilege log practices were similarly improper. As noted previously, on April 13, 2018—the day of the 2018 Claw-back and after a fourteen-month delay—WW tendered the 2018 Logs to Plaintiffs. In those Logs, WW re-wrote nearly every description of previously identified documents to remove critical details, including all pre-October 2011 references to franchising.

Remarkably, several of the documents in the 2018 Claw-back were included in the 2016 Claw-back, only to be released in 2016 and later clawed back yet again in 2018.

47. Finally, as discussed below in connection with Plaintiffs' request for sanctions and as set forth in Appendix B to this Order and Opinion, a substantial number of the Challenged Claw-back Documents are not privileged at all. Indeed, based on its review of the Challenged Claw-back Documents, the Court has concluded that no less than 122 of the 280 documents—a staggering 44%—are non-privileged in whole or in part, further evidencing WW's reckless approach to discovery and insouciant reliance on assertions of privilege.

48. Based on this record, the Court concludes that (i) WW's 2018 Claw-back was unreasonable, both in its scope and its substance; (ii) WW's 2018 Claw-back was not timely and involved unreasonable, unjustified, and excessive delay; and (iii) WW acted in a completely reckless manner with respect to its privilege, as shown through the 2018 Claw-back.

49. Moreover, Plaintiffs contend, and the Court agrees based on the evidence submitted, that WW's unreasonable delay in initiating the 2018 Claw-back and in serving the 2018 Logs "upended Plaintiffs' preparation for and conduct of a number of the most important depositions" in these cases, including the depositions of Ms. Vannoy, Mr. Vannoy, McBride, Mathis, and Blackburn. (Pls.' Resp. Goode Aff. 7.) The Court finds entirely plausible Plaintiffs' contention that in the years since their production, many of the 2018 Claw-back documents have been "woven into Plaintiffs' strategy" and that the 2018 Claw-back "limited or foreclosed altogether—with very

little notice—areas of examination that are central to the franchise issues in the case and that Plaintiffs had long intended to pursue with these witnesses." (Pls.' Resp. Goode Aff. 8.) Accordingly, the Court concludes that Plaintiffs have been unfairly and unduly prejudiced by the 2018 Claw-back.

50. For these reasons, to the extent that the Challenged Claw-back Documents are in fact privileged, the Court concludes, in the exercise of its discretion, that WW has waived any such claim of privilege or work-product immunity as to those documents. The Challenged Claw-back Documents shall therefore be produced to Plaintiffs and made available for use by any party to these actions for purposes of this litigation.

### b. Subject Matter Waiver by Voluntary Production

51. Plaintiffs further argue that by voluntarily producing privileged documents reflecting discussions with counsel about franchise compliance issues, WW waived the protections of the attorney-client privilege and work-product immunity doctrine more broadly as to that same subject matter. On this issue, the Court disagrees.

52. Plaintiffs base their argument on WW's voluntary production of certain minutes from meetings of WW's Board in 2011 (the "Minutes"), (Pls.' Br. Supp. Waiver Mot. Ex. S [hereinafter "Minutes"], ECF No. 447.20), and, in particular, from an August 11 Board meeting (the "August 2011 Minutes"). The August 2011 Minutes describe in detail an exchange between Ms. Vannoy, Mr. Vannoy, and the WW Board about WW's non-compliance with certain franchising laws, (Minutes 1–4), and specifically report that Ms. Vannoy told the WW Board that, based on her

conversation with outside counsel Taylor, "our franchises do not comply" with certain laws and "we are hoping to get a handle on how franchises are to be handled in each state," (Minutes 2). WW has not sought to claw back these Minutes.

53.     According to Plaintiffs, WW selectively produced the Minutes to create the appearance that WW was not aware of the applicability of franchise laws prior to August 2011. Plaintiffs further contend that WW, in an effort to paint a false narrative, clawed back all pre-August 2011 documents relating to franchise law compliance issues and instructed Ms. Vannoy not to answer related deposition questions, including questions concerning the August 2011 Minutes, on the basis of privilege.

54.     While WW failed to respond to Plaintiffs' subject matter waiver argument in its brief in opposition to the Waiver Motion, WW's counsel argued at the August 22 Hearing that WW produced the Minutes because the same set of documents had been previously produced to third parties in a prior lawsuit and thus could not be claimed as privileged in these actions. WW's counsel contended that subject matter waiver is inappropriate because WW's production was not made to gain a strategic advantage.

55.     "Deciding whether a waiver of privilege as to one communication 'also ends the privilege as to any related but not disclosed communications' is a difficult question that has often divided courts." *Technetics Grp. Daytona, Inc. v. N2 Biomedical, LLC*, 2018 NCBC LEXIS 116, *15–16 (N.C. Super. Ct. Nov. 8, 2018) (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007)). In *Technetics Group Daytona,*

*Inc.*, this Court considered the extent to which the disclosure of privileged information results in subject matter waiver. *Id.* at \*15–19. After describing positions taken by various federal courts, this Court applied a fairness balancing approach in which subject matter waiver is applied for remedial, rather than punitive, purposes. *Id.* at \*16–19; *see Wi-LAN, Inc. v. LG Elecs., Inc.*, 684 F.3d 1364, 1373 (Fed. Cir. 2012) ("[T]he heavy weight of current authority . . . comes down on the side of employing fairness considerations to decide the scope of waivers.").

56. Under this balanced approach, "when a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982); *see In re Teleglobe Commc'ns Corp.*, 493 F.3d at 361 ("When one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage."). "On the other hand, 'when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed.'" *Technetics Grp. Daytona, Inc.*, 2018 NCBC LEXIS 116, at \*18 (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 361). "This is especially so in the case of an extrajudicial disclosure made outside the context of litigation." *Id.*; *see XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 24 (1st Cir. 2003) ("[T]he extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential

communications on the same subject matter."); *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) ("[W]here . . . disclosures of privileged information are made extrajudicially and without prejudice to the opposing party, there exists no reason in logic or equity to broaden the waiver beyond those matters actually revealed.").

57.    Here, taking WW's counsel at its word that the Minutes were only produced to Plaintiffs in these actions because the Minutes were previously disclosed to third parties in unrelated litigation, the Court concludes, in the exercise of its discretion, that production was not made to gain a litigation advantage in these actions and thus that subject matter waiver is not appropriate on the facts of record here.  Therefore, the Waiver Motion shall be denied to the extent Plaintiffs seek a finding that WW waived privilege as to franchise compliance law issues by voluntarily producing the Minutes.

2.    Crime-Fraud Exception[23]

58.    Although "the attorney-client privilege is one of the oldest recognized privileges for confidential communications" and "promote[s] broader public interests in the observance of law and the administration of justice[,]" *Dickson v. Rucho*, 366 N.C. 332, 340, 737 S.E.2d 362, 368 (2013) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)), there exists a crime-fraud exception to the privilege, which

---

[23] The Special Master was not asked to consider, and thus did not consider, the applicability of the crime-fraud exception.  Moreover, the Court has not reviewed *in camera* those Sample Log Documents that the Master concluded were properly withheld on the basis of privilege. In addition, for the reasons discussed *infra*, the Court declines to consider the Gallagher Affidavit.  Thus, the Court's analysis as to the applicability of the crime-fraud exception is based on its review of the Challenged Claw-back Documents, the Sample Log Documents that the Master found to be non-privileged, and other evidence offered by Plaintiffs in support of the Waiver Motion, with the exception of the Gallagher Affidavit.

may be invoked in "certain extraordinary circumstances," *Miller*, 357 N.C. at 335, 584 S.E.2d at 786 ("When certain extraordinary circumstances are present, the need for disclosure of attorney-client communications will trump the confidential nature of the privilege."). The crime-fraud exception exists to recognize that "the attorney-client privilege cannot serve as a shield for fraud or as a tool to aid in the commission of future criminal activities; if a communication is not 'made in the course of seeking or giving legal advice for a proper purpose,' it is not protected." *Id.* (quoting *State v. Jennings*, 333 N.C. 579, 611, 430 S.E.2d 188, 204 (1993)); *see State v. Davenport*, 227 N.C. 475, 498, 42 S.E.2d 686, 702–03 (1947) ("[T]he communication must have been made in the course of seeking legal advice for a proper purpose; hence, no privilege exists where advice is sought in aid of a contemplated violation of law.").

59. Plaintiffs argue that the crime-fraud exception should apply here because WW was aware that it was required to comply with franchise laws by no later than May 2010 but (i) continued to push Plaintiffs to sign "licensing agreements" that expressly disclaimed a franchise relationship with WW[24] and (ii) failed to make certain disclosures required of franchisors under applicable law, including the FTC's

---

[24] According to Plaintiffs, WW used Ms. Vannoy to draft licensing agreements and present the agreements to Plaintiffs for execution while fully aware that these agreements falsely disclaimed the existence of a franchise relationship between the parties. (*See, e.g.*, Lomax Dep. 111:14–112:1, ECF No. 447.9; B. Vannoy Dep. 242:19–248:17; Ingle Dep. 140:24–141:6; Pls.' Br. Supp. Waiver Mot. Ex. J, at 10–11, ECF No. 447.11 ("Nothing in this Licensing Agreement shall be deemed to create any type of . . . franchise, or other business relationship other than LICENSOR and LICENSEE.").)

Franchise Disclosure Rule. As noted previously, Plaintiffs contend that WW used its in-house counsel, Ms. Vannoy, to perpetrate these alleged frauds.[25]

60. WW responds that (i) Plaintiffs have not alleged the type of crime or fraud necessary to trigger the exception, (ii) Plaintiffs have not shown any privileged communications were in furtherance of a crime or fraud, and (iii) even if the exception applies, Plaintiffs' proposed application here overreaches the exception's boundaries. Additionally, Ms. Vannoy argues that the exception does not apply because neither she nor WW were aware that WW was subject to franchise laws and thus could not have been involved in a fraud to conceal such information from Plaintiffs.[26]

61. WW first argues that Plaintiffs have not "shown the type of crime or fraud necessary to trigger the exception" because there "is nothing inherently immoral about not registering a franchise, or otherwise complying with the technical rules governing franchises." (WW's Resp. Pls.' Waiver Mot. 8–9, ECF No. 481.) In making this argument, WW relies on *Hughes v. Boone*, 102 N.C. 137, 9 S.E. 286 (1889), a long-ago case in which our Supreme Court noted that, for the exception to apply, triggering conduct "must be an act criminal, *per se*, not simply *malum prohibitum*."[27] *Id.* at 160,

---

[25] Under North Carolina law, fraud has five essential elements: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9, 812 S.E.2d 831, 837 (2018) (quoting *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 117, 343 S.E.2d 879, 884 (1986)).

[26] While Ms. Vannoy is not a party to these actions, the Court, by Order dated May 17, 2018, granted Ms. Vannoy leave to submit a responsive brief in opposition to Plaintiffs' Waiver Motion and to participate in the August 22 Hearing.

[27] "An offense *malum in se* is properly defined as one which is naturally evil as adjudged by the sense of a civilized community, whereas an act *malum prohibitum* is wrong only because made so by statute." *State v. Horton*, 139 N.C. 588, 592, 51 S.E. 945, 946 (1905).

9 S.E. at 292. WW does not cite, and the Court's research has not disclosed, any subsequent North Carolina case applying this standard. Additionally, the few modern North Carolina decisions discussing the crime-fraud exception make no distinction between acts criminal *per se* and acts *malum prohibitum*.[28] *See Miller*, 357 N.C. at 335, 584 S.E.2d at 786; *Davenport*, 227 N.C. at 498, 42 S.E.2d at 702–03. Accordingly, the Court concludes that *Hughes* does not provide the rule of decision here. The Court thus holds that application of the crime-fraud exception is not limited only to cases involving acts that are criminal *per se*.

62. While the Court rejects *Hughes* as controlling, the Court nevertheless acknowledges that there is little case law in this State applying the crime-fraud exception or defining its contours. Decisions from federal courts, however, provide

---

[28] It appears that beginning at the end of the nineteenth century, courts largely abandoned the standard followed in *Hughes*. One scholar has described the evolution of the crime-fraud exception in the United States in this way:

Until a century ago, the [crime-fraud] exception was only available if the client consulted the attorney intending to commit some crime that was *malum in se*. The difficulty . . . was that crimes *mala in se* were not co-extensive with actions generally held to be morally wrong. In particular, a fraudulent conveyance was merely *malum prohibitum*, perhaps because it was neither an indictable offense at common law nor a statutory felony, but a statutory misdemeanor of Elizabethan date. The decision of the Queen's Bench in *Regina v. Cox*[, 14 Q.B.D. 153 (1884)] was revolutionary partly because it disregarded the distinction between *mala in se* and *mala prohibita*. On the other hand, *Cox* can be read as reaffirming the importance of the real or underlying distinction by focusing on the blameworthiness of the clients' intention as viewed by the standards of ordinary commercial morality. By contrast, the overwhelming modern tendency is to extend the exception to all crimes, without regard to the blameworthiness of the client's exploitation of the attorney's advice. If a client consults an attorney in furtherance of some action prohibited by statute, the privilege is dissolved without any examination of whether the breach is morally reprehensible.

David J. Fried, *Too High a Price for Truth: the Exception to the Attorney-client Privilege for Contemplated Crimes & Frauds*, 64 N.C.L. Rev. 443, 470 (1986).

useful guidance.[29]  Federal decisions hold that the party invoking the crime-fraud exception must make a prima facie showing that otherwise privileged communications fall within the exception.  *See, e.g., United States v. Under Seal (In re Grand Jury Proceedings #5)*, 401 F.3d 247, 251 (4th Cir. 2005).  The invoking party must show that "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud."  *Id.*  "Prong one of this test is satisfied by a prima facie showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed."  *Id.*  "Prong two may be satisfied with a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity."  *Id.*

63.  Although courts routinely apply the two-pronged test enumerated above, they "are divided as to the appropriate quantum of proof necessary to make a *prima facie* showing."  *In re Grand Jury*, 705 F.3d 133, 151–53 (3d Cir. 2012).  The Third Circuit recently described the differing articulations of the proper measure of proof as follows:

> Some [courts] require there to be probable cause or a reasonable basis to suspect or believe that the client was committing or intending to commit a crime or fraud and that the attorney-client communications were used in furtherance of the alleged crime or fraud.  Other courts call for evidence sufficient to compel the party asserting the privilege to come forward with an

---

[29]  In defining the contours of other exceptions to the attorney-client privilege, the Supreme Court of North Carolina has recognized that it is appropriate to look to federal case law for guidance.  *See, e.g., Miller*, 357 N.C. at 330–31, 584 S.E.2d at 783–84 ("Significantly, our General Assembly has not seen fit to enact . . . statutory provisions for the attorney-client privilege, and we must look solely to the common law for its proper application.").

explanation for the evidence offered against the privilege. Still other courts demand a showing of evidence that, if believed by a trier of fact, would establish that some violation was ongoing or about to be committed and that the attorney-client communications were used in furtherance of that scheme.

*Id.* at 152 (citations omitted) (applying a "reasonable basis" standard); *see In re Grand Jury Proceedings #5*, 401 F.3d at 251 ("[T]he proof 'must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted.'" (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976))). At least one court has imposed a higher standard for invoking the crime-fraud exception in the civil context, recognizing that different interests are involved in a grand jury or criminal proceeding. *See UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*, 479 F.3d 1078, 1094–96 (9th Cir. 2007) (adopting a "preponderance of the evidence" standard in a civil case and noting that a lower "reasonable cause" standard is appropriate in the grand jury context).[30]

64. In light of the "public's interest in protecting the attorney-client privilege," *Miller*, 357 N.C. at 328, 584 S.E.2d at 782, and the "dangers associated with invoking

---

[30] Many cases addressing the crime-fraud exception involve grand jury investigations. While the attorney-client privilege generally functions identically in both civil and criminal proceedings, *see Swidler & Berlin*, 524 U.S. at 408–09, several courts have recognized that the crime-fraud exception may apply differently in the grand jury context, *see In re Napster Copyright Litig.*, 479 F.3d at 1094–95 ("[I]n a civil case the burden of proof that must be carried by a party seeking outright disclosure of attorney-client communications under the crime-fraud exception should be preponderance of the evidence."); *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 97 n.8 (3d Cir. 1992) ("We confine our discussion regarding the appropriate procedures to be followed in ascertaining the applicability of the crime-fraud exception to the civil context and intimate no view as to whether the same procedures should be used in the grand jury context."); *see also United States v. Auster*, 517 F.3d 312, 319 (5th Cir. 2008) ("The public interest at stake in a criminal trial of any sort is substantial, more so than in a civil case[.]"); *In re Sealed Grand Jury Subpoenas*, 810 F. Supp. 2d 788, 793 (W.D. Va. 2011) ("Based at least in part on the public's strong *interest in investigating and prosecuting crime*, the federal courts . . . have recognized a 'crime-fraud' exception to the attorney-client privilege." (emphasis added)).

exceptions" to the privilege, *id.* at 331, 584 S.E.2d at 784, the Court concludes that a preponderance of the evidence standard is appropriate in the civil context, *see Napster Copyright Litig.*, 479 F.3d at 1095 ("[R]equiring a moving party to establish the existence of the crime-fraud exception by a preponderance of the evidence is consonant with the importance of the attorney-client privilege. . . . It would be very odd if in an ordinary civil case a court could find such an important privilege vitiated where an exception to the privilege has not been established by a preponderance of the evidence."). Indeed, under North Carolina Rule of Evidence 104(a), preliminary questions of fact concerning privileges must be established by a preponderance of the evidence. *State v. McGrady*, 368 N.C. 880, 892, 787 S.E.2d 1, 10 (2016); *see Napster Copyright Litig.*, 479 F.3d at 1095–96 (concluding "preliminary questions concerning the existence or non-existence of the attorney-client privilege—including whether the crime-fraud exception terminate[s] the privilege—must be established under [Federal Rule of Evidence] 104(a)." (citations and quotation marks omitted)). Thus, the Court concludes that a party seeking to invoke the crime-fraud exception to defeat the attorney-client privilege in a civil case must bear the burden of showing by a preponderance of the evidence that the opposing party was committing or intending to commit a crime or fraud and that the attorney-client communications were used in furtherance of the alleged crime or fraud.

65. "While [a prima facie] showing may justify a finding in favor of the offering party, *it does not necessarily compel such a finding*." *Duplan Corp.*, 540 F.2d at 1220 (emphasis added). A trial court's determination that a party "made a prima facie

showing of crime or fraud should be upheld absent a clear showing of abuse of discretion." *In re Grand Jury Proceedings #5*, 401 F.3d at 254 (quotation marks omitted).

66. In applying the crime-fraud exception, "it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege." *Id.* at 251. In this instance, Ms. Vannoy's knowledge and intentions must be carefully examined because WW's alleged fraudulent conduct occurred through Ms. Vannoy's service as WW's in-house counsel. *See Norburn v. Mackie*, 262 N.C. 16, 24, 136 S.E.2d 279, 285 (1964) ("[A] principal is chargeable with . . . the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends, although the agent does not in fact inform his principal thereof.").

67. Plaintiffs offer evidence purporting to show that, by no later than May 2010, WW generally, and Ms. Vannoy in particular, were aware that WW was operating as a franchisor under applicable law. In its brief in opposition to the Waiver Motion, WW neither concedes nor disputes Plaintiffs' contention that WW knew it was a franchisor by May 2010. (*See* WW's Resp. Pls.' Waiver Mot. 11 ("Plaintiffs spend much of their brief quibbling about when WW knew that it was a franchisor and whether it should have made the conversion sooner[.] But WW cured its alleged violation seven years ago and gave the Plaintiffs the right to leave the WW system if they were dissatisfied after receiving the FDD's full disclosure.").) Ms. Vannoy, however, contends that (i) WW was not subject to state or federal franchise laws prior

to its conversion to a franchise system in October 2011 and (ii) even if WW had been a covered franchisor prior to that time, neither she nor WW was aware of that fact prior to the October 2011 "conversion."[31]

68.     Turning first to whether WW was subject to franchise laws prior to October 2011, it is important to note that, for purposes of the federal Franchise Disclosure Rule, a business arrangement is considered a "franchise" if it meets three definitional elements. *See* 16 C.F.R. § 436.1(h). The FTC, which oversees enforcement of the Franchise Disclosure Rule, has stated that "[t]he name given to the business arrangement is irrelevant in determining whether it is covered" by the Rule. FTC Franchise Rule Compliance Guide 1 (2008); (*see* Hurwitz Aff. ¶ 16, ECF No. 481.7 ("[W]hat determines a franchise is not the label you apply to the relationship but the substance of the relationship.").)

69.     Neither WW nor Ms. Vannoy offer evidence to suggest that WW changed its business methods between May 2010 and the fall of 2011 so as to create a franchise relationship with its store owners when such a relationship had not existed previously. (*Cf.* B. Vannoy Dep. 105:8–16 ("Q. [W]as there a change in the way business was done that caused [WW] to become a franchise system? . . . . A. And once again, I'll just say I don't know. As I sit here today, I don't know."), 113:19–114:6, 182:19–183:2; J. Vannoy Dep. 71:18–72:5 ("Q. Was there anything that changed in the way that [WW] conducts its business between the time that it was

---

[31] In briefing the Waiver Motion, WW did not address whether it "converted" to a franchise system. At the August 22 Hearing, however, WW's counsel suggested that whether WW converted to a franchise system should be an issue resolved at trial.

operating and treating itself as a licensor as opposed to today? . . . [A.] Well, we – I'm not a franchise lawyer, but, you know, we – as a franchisor, we do things that the state and federal laws require that we do under franchising law. That's the best way I know how to answer that.").)

70. In October 2011, WW acknowledged that it had previously been operating as a franchisor in violation of federal law and the laws of certain states.[32] In an October 28, 2011 letter from Whitworth and WW's then-President Dana Deem ("Deem")[33] to store owners, including Plaintiffs, WW stated as follows:

> As you all know, [WW] defines our business relationship with you as a Licensor/Licensee relationship. We have determined however that the Federal Trade Commission, and some states that have franchise laws, would classify our relationship as a Franchisor/Franchisee relationship rather than that of a Licensor/Licensee. Once we made this determination and learned that we were in violation of certain Federal and State Franchise Laws, we began working toward compliance, which ultimately means redefining our business relationship with you as that of a Franchisor and Franchisee.
>
> . . . .
>
> As part of this conversion process, and because [WW] failed to comply with Federal and State Laws by presenting to you a Franchise Disclosure Document *prior to your purchase of a license* to own and operate your [WW] business, we must now offer you two options: 1) you may convert from a licensee to a franchisee; or 2) you may rescind your [WW] Licensing Agreement and end your business relationship with [WW].

---

[32] In 2011, WW entered into a Stipulation to Desist and Refrain Order with the California Corporations Commissioner in which WW acknowledged that, beginning in 2002, WW unlawfully sold numerous franchises (within the meaning of the California Corporations Code) pursuant to "Licensing Agreements." The California Corporations Code's definition of "franchise" contains three definitional elements similar to those in the FTC's Franchise Disclosure Rule. *Compare* Cal. Corp. Code § 31005(a), *with* 16 C.F.R. § 436.1(h).

[33] Deem served as WW's President from 2011 until 2015, having previously served as WW's Vice President.

(Pls.' Br. Supp. Waiver Mot. Ex. K, ECF No. 447.12 (emphasis added). Accordingly, the Court concludes that there exists substantial evidence tending to show that WW was operating a franchise system at the time Ms. Vannoy became WW's in-house counsel in June 2010 and thus prior to its purported "conversion" in October 2011.

71.     Ms. Vannoy argues against the Court's conclusion, but her testimony that WW did not operate a franchise system until its October 2011 conversion, (*see, e.g.*, B. Vannoy Dep. 101:7–14 ("**Q.** When did [WW] start operating a franchise system? **A.** After we sought the advice of counsel and made the decision to convert based on feedback received from registration states. **Q.** And that was in the fall of 2011; is that correct? **A.** Correct."); 181:3–12 ("It is my testimony that [WW] was not a franchise system prior to consulting with Ritchie Taylor, therefore, we were not required to comply with franchise laws.")), is at odds with WW's August 2011 Board minutes, which report that Ms. Vannoy told the Board that, based on her conversation with Taylor, "our franchises do not comply" with certain franchise laws and "we are hoping to get a handle on how franchises are to be handled in each state[,]" (Pls.' Br. Supp. Waiver Mot. Ex. S, at 2, ECF No. 447.20). As a result, the Court does not find Ms. Vannoy's contentions persuasive on this issue.

72.     The Court turns next to whether Plaintiffs have carried their burden of showing by a preponderance of the evidence that WW and/or Ms. Vannoy were aware that WW was operating franchise relationships with Plaintiffs at the time Ms. Vannoy presented them "licensing agreements" disclaiming any such relationship.

73.     In support of their position that WW was aware that it was subject to state and federal franchise laws no later than May 2010, Plaintiffs principally rely on the following evidence:

a. A $300,000 payment to Ted Moore ("Moore"). In May or June 2010, Moore, a non-Plaintiff store owner, approached WW and informed Ms. Vannoy, Mr. Vannoy, Whitworth, WW's then-President Blair Ingle ("Ingle"),[34] and then-Vice President Deem that, by claiming store owners were "licensees" when they were actually franchisees, WW was violating applicable franchising laws. (Moore Dep. 48:15–50:17, 70:19–71:22, 76:14–78:10, ECF No. 447.4; B. Vannoy Dep. 127:17–148:19, 154:11–14; J. Vannoy Dep. 126:19–133:21, 226:5–229:20.) WW subsequently paid Moore $300,000 under a written "consulting agreement," (Moore Dep. 88:12–89:19), although Moore contends that he did not perform any consulting services for WW under the alleged agreement, (Moore Dep. 49:7–11, 85:8–16, 90:4–9; *see* J. Vannoy Dep. 227:14–19; Gallagher Dep. 337:16–338:21, ECF No. 447.2). According to Moore, the consulting agreement—which is not in the record before the Court—included a confidentiality provision. (Moore Dep. 90:24–91:2.) Plaintiffs contend that the $300,000 payment was intended to buy Moore's silence concerning the franchise nature of WW's business relationships with Plaintiffs and other store owners. (*See* Moore Dep. 70:19–71:22, 97:1:– 25.) Ms. Vannoy and Mr. Vannoy, however, testified that the payment was

---

[34] Ingle served as WW's President from 2009 through 2011.

an effort to resolve several, as yet unidentified issues, only one of which was related to franchising.[35]  (B. Vannoy Dep. 143:5–17; J. Vannoy Dep. 127:5–10.)[36]

b. Deposition testimony of WW's in-house accountant, Bridgett Mathis ("Mathis"),[37] stating that WW commissioned an audit in May 2010 because WW "needed [an audit] in order to be a franchisor."  (Mathis Dep. 103:21–104:14, ECF No. 447.14.)

---

[35]  While Plaintiffs' brief in support of the Waiver Motion prominently argues that WW's payment to Moore was intended to keep him quiet about WW's non-compliance with franchise laws, WW's response brief does not mention Moore.  Nor did WW's counsel address Plaintiffs' allegations relating to Moore at the August 22 Hearing.  Ms. Vannoy, however, through her brief in opposition to the Waiver Motion, argues that Moore only raised the franchise law issue as a "negotiating stratagem" and that WW reached "a voluntary settlement with Moore on the legitimate issues he raised," and that "[a]ny contention that WW was violating any franchise laws was not one of those legitimate issues."  (Resp. Anna Elizabeth Vannoy Pls.' Waiver Mot. 12–13, ECF No. 483.)  Ms. Vannoy's brief does not identify the "legitimate issues" Moore raised to justify the $300,000 settlement, however.  Rather, Ms. Vannoy cites—without explanation—to vague deposition testimony concerning "grey territory."  (B. Vannoy Dep. 131:10–21 ("Q. [W]alk me through that conversation [with Moore].  A. I recall there being an issue over grey territory.  I don't recall the specifics of that discussion, and I recall [Moore] telling us that his neighbor thought that we were a franchise system."); J. Vannoy Dep. 127:5–10 ("Q. [W]hat do you recall Mr. Moore asserting?  A. I think Mr. Moore had an issue, as best I can recall, about the grey territories.  I think there was an issue about his particular license and – and franchising.").)  On the current record, the significance, if any, of "grey territory" is unclear.

[36]  Ms. Vannoy and Mr. Vannoy both testified that Moore's allegations concerning WW's non-compliance with franchise laws did not prompt them to consider whether WW was in fact violating franchise laws.  (J. Vannoy Dep. 127:21–128:16 ("Q. And as corporate counsel, did you look into [Moore's] assertions to determine whether or not he was correct?  [A.] No. . . . Q. Okay. Did anybody?  [A.] Not to my knowledge, no."); B. Vannoy Dep. 137:6–138:9.  *But see* B. Vannoy Dep. 136:16–137:14 ("Q. Did you look into the issue of whether or not Window World should be complying with franchise laws after Mr. Moore raised that issue? . . .  A. Well, I sought the advice of counsel eventually, yes."), 138:10–20.)

[37]  Mathis (formerly Bridgett Beck and Bridgett Pratt) served as WW's Controller and later became WW's Chief Financial Officer.  She joined the WW Board in 2015.

c. A May 24, 2010 e-mail from WW's outside accountant, Randy Blackburn ("Blackburn"), to Ingle in which Blackburn stated that, "[a]fter speaking with [Mr. Vannoy] last week, I understand that [the audit] would be a requirement of [WW's] disclosures needed for acting as franchisor instead of a licensor moving forward." (Pls.' Br. Supp. Waiver Mot. Ex. N, ECF No. 447.15.)

d. Documents titled "franchise agreements" entered between WW and store owners in 1998. (Pls.' Br. Supp. Waiver Mot. Ex. A, at 1–25.)

e. WW's profit and loss statement from September 2003 which identifies "Franchise Income" as a line item. (Pls.' Br. Supp. Waiver Mot. Ex. A, at 34.)

f. Internal WW documents from 2001, 2005, and 2007 in which WW referred to stores as "Franchise[s]." (Pls.' Br. Supp. Waiver Mot. Ex. A, at 29–31, 37–39, 52–54.)

g. A complaint filed in 2007 by a store owner against WW in Washington alleging violations of the Washington Franchise Investment Protection Act. (Pls.' Br. Supp. Waiver Mot. Ex. A, at 41–50.)

h. Minutes from a March 2011 meeting of the WW Board which identified "Franchising Disclosure" as a topic of discussion. (Pls.' Br. Supp. Waiver Mot. Ex. A, at 56.)

i. WW's description in its 2017 Logs of a May 2010 e-mail from Deem to Ms. Vannoy as "[e]mail correspondence . . . regarding information needed for FDD."[38]

74. Ms. Vannoy vigorously disputes the inferences Plaintiffs urge the Court to draw from this evidence. In particular, Ms. Vannoy testified that (i) her "due diligence" beginning in May 2010 was not to determine whether WW was subject to franchise laws, but rather because Mr. Vannoy "suggested" that she "look into it at some point," and "to prepare [herself] to meet with Mr. Taylor," to access his franchise law expertise, (B. Vannoy Dep. 136:16–141:7); (ii) no later than July 2010, she "started gathering information based on what [she] had learned would go into" an FDD, and she "used the guidelines for the FDD in order to know what kind of information would need to be analyzed by an expert," here Taylor, (B. Vannoy Dep. 124:21–23, 200:1–203:20); (iii) prior to contacting Taylor in June 2011, she had not "started gathering documents for the FDD," (B. Vannoy Dep. 127:10–15); (iv) neither she nor WW was aware of the application of federal franchise law prior to her June 2011 meeting with Taylor, (B. Vannoy Dep. 226:9–24); and (v) she had not started

---

[38] WW's 2018 Logs, which WW tendered just days before Ms. Vannoy's deposition, describe the same document as e-mail correspondence "regarding data gathering with respect to potential compliance issues." According to Plaintiffs, the revised document descriptions in WW's 2018 Logs, coupled with WW's decision to simultaneously claw back previously produced documents related to franchising, "appears to be a ham-fisted effort to conform the documentary evidence to Vannoy's anticipated deposition testimony." (Pls.' Br. Supp. Waiver Mot. 4, ECF No. 447.)

taking steps to bring WW into compliance with franchise laws prior to her meeting with Taylor,[39] (B. Vannoy Dep. 197:15–23).

75.    While the evidence Plaintiffs have offered to show that WW, and Ms. Vannoy in particular, knew or, at least, should have known that WW was operating as a franchisor for purposes of the FTC's Franchise Disclosure Rule is compelling, the Court is not prepared, on this record and in the context of these motions, to conclude, based on the preponderance of the evidence, that WW and Ms. Vannoy knew that WW was subject to state and federal franchise laws no later than May 2010.

76.    First, while Plaintiffs have offered evidence tending to show that WW, through Ms. Vannoy, began researching franchise law and systems by no later than May 2010 (as WW's outside counsel), they have not offered evidence on which the Court is prepared to conclude that her conduct was motivated by WW's knowledge that it was then violating franchise laws.  According to Ms. Vannoy, "business reasons were the sole impetus for considering a possible conversion to a franchise system – not any regulatory compliance concerns." (Resp. Anna Elizabeth Vannoy Pls.' Waiver Mot. 14, ECF No. 483.)

77.    In addition, Ingle, a witness now hostile to WW, testified that, in 2010, WW was "going through the process of moving . . . to a franchisor state."  (Ingle Dep. 135:21–136:4, ECF No. 447.3.)  Ingle further testified that "it [was] a business

---

[39] Ms. Vannoy further contends that she "did not begin preparing an FDD before meeting with Mr. Taylor[.]" (Resp. Anna Elizabeth Vannoy Pls.' Waiver Mot. 15; *see* B. Vannoy Dep. 205:1–4 ("Q. [D]id you try to prepare an FDD yourself and then realize, you know, I really need to go see an expert?  A. No.").)  She also asserts that, between July 2010 and the fall of 2011, she did not attempt to revise WW's licensing agreements so they would comply with franchise laws.  (B. Vannoy Dep. 205:5–12.)  [REDACTED]

decision to go in this [franchising] direction" and noted his disagreement with the suggestion that WW's movement towards a franchising model was an "attempt to comply" with franchise laws. (Ingle Dep. 135:6–136:21.) While Ms. Vannoy and WW may well have erroneously concluded that WW's chosen labels—"licensor" or "franchisor"—controlled its legal obligations, based on the current record, the Court does not conclude that WW and Ms. Vannoy acted as they did because they understood that WW was then violating federal and state franchise laws.[40]

78. Additionally, it is undisputed that Ms. Vannoy is not an expert in franchise law and, as a 2006 law school graduate, had very limited practice experience when these events unfolded. It is also undisputed that, as of May 2010, Ms. Vannoy did not have training or education in franchising law, with the exception of a CLE course on franchise law that she attended in January 2010. (B. Vannoy Dep. 32:7–33:9.) Ms. Vannoy credibly claims that she did "not feel that [she] was that educated on franchise laws" and was unable to render an opinion as to whether WW was in fact a franchisor. (B. Vannoy Dep. 203:2–7.) She also offers the affidavit of Ann Hurwitz, a franchising expert, to support her position that her conduct was reasonable, given the complexity of franchise law. (*See* Hurwitz Aff. ¶ 30 ("These are not easy determinations to make, and many businesses (and their counsel) struggle with these issues.").)

79. Moreover, Ms. Vannoy began working as WW's sole in-house counsel in June 2010, (B. Vannoy Dep. 25:22–26:5), was on maternity leave from early July 2010

---

[40] The Court notes, however, that a jury at trial, or the Court upon presentation of further evidence in later proceedings, may certainly conclude otherwise.

through October 2010, (B. Vannoy Dep. 202:8–15), and testified that upon her return, "there were other things that Blair [Ingle] wanted [her] to do right away," (B. Vannoy Dep. 202:2–7). Taken together, Ms. Vannoy's limited training, experience, and time on the job in the period between May 2010 and June 2011 make credible her contention that she did not know what WW's legal obligations were and, further, that she was researching franchise disclosure obligations and preparing for the day when WW might determine, or be advised, that its business relationships with Plaintiffs and other store owners was that of franchisor-franchisee.[41]

80. In reaching these conclusions, it bears restating both that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," *Upjohn Co.*, 449 U.S. at 389, and that our Supreme Court has cautioned of the "dangers associated with invoking exceptions" to the privilege, *Miller*, 357 N.C. at 331, 584 S.E.2d at 784; *see also Duplan Corp.*, 540 F.2d at 1220 ("While [a prima facie] showing may justify a finding in favor of the offering party, it does not necessarily compel such a finding."). In the circumstances and record presented here, the Court concludes that Plaintiffs have failed to carry their burden to show by a preponderance of the evidence that the crime-

---

[41] The Court hastens to add that Ms. Vannoy's credibility will certainly be an issue at any trial of this matter, particularly given the clear conflict between statements she made in e-mails she sent during the relevant time period and her deposition testimony in these actions. The Court's recognition of these discrepancies in testimony, however, which largely concern the actions she took in preparing FDDs and when, do not dissuade the Court from its conclusion on the Waiver Motion that Ms. Vannoy has not been shown, on this record, to have been preparing the FDDs because she knew WW was then in violation of federal and state franchise laws.

fraud exception applies in the present actions. Accordingly, Plaintiffs' Waiver Motion shall be denied to the extent Plaintiffs seek an order finding WW waived the attorney-client privilege by operation of the crime-fraud exception.

C.    Plaintiffs' Motion to Compel and the Parties' Exceptions[42]

81.    "The primary purpose of the discovery rules is to facilitate the disclosure prior to trial of any *unprivileged* information that is relevant and material to the lawsuit so as to permit the narrowing and sharpening of the basic issues and facts that will require trial." *Friday Invs., LLC v. Bally Total Fitness of the Mid-Atl., Inc.*, 805 S.E.2d 664, 667 (N.C. 2017) (quoting *Bumgarner v. Reneau*, 332 N.C. 624, 628, 422 S.E.2d 686, 688–89 (1992)).  To that end, Rule 26 allows parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." N.C. R. Civ. P. 26(b)(1).  As an enforcement mechanism, Rule 37 allows for the filing of a motion to compel where a party has not responded to a discovery request or the party's responses are "evasive or incomplete." N.C. R. Civ. P. 37(a)(2)–(3).

82.    "The party resisting discovery bears the burden of showing why the motion to compel should not be granted." *Nat'l Fin. Partners Corp. v. Ray*, 2014 NCBC

---

[42] This section includes a discussion of the Court's review of the Sample Log Documents (i.e., documents which WW withheld from Plaintiffs in whole or in part on the basis of privilege or work-product immunity).  Given the procedural posture of these actions, and in light of WW's indication that it may appeal the Court's rulings on the Privilege Motions, (*see* WW's Resp. Pls.' Waiver Mot. 13 ("[N]o documents should be released or disclosed to Plaintiffs without sufficient advance notice to WW to allow WW an opportunity to file an appeal[.]"), the Court has written the Order and Opinion to avoid disclosure of the substantive content of any Sample Log Document, unless WW has previously disclosed or produced the content of the document to Plaintiffs.  All documents discussed, however, are identified by Sample Log Document number and are available for review on appeal.

LEXIS 50, at *26 (N.C. Super. Ct. Oct. 13, 2014) (quoting *Smithfield Bus. Park, LLC v. SLR Int'l Corp.*, No. 5:12-CV-282-F, 2014 U.S. Dist. LEXIS 110535, at *7 (E.D.N.C. Aug. 11, 2014)). "Whether or not the party's motion to compel discovery should be granted or denied is within the trial court's sound discretion and will not be reversed absent an abuse of discretion." *Phelps-Dickson Builders, LLC v. Amerimann Partners*, 172 N.C. App. 427, 433, 617 S.E.2d 664, 668 (2005) (quoting *Wagoner v. Elkin City Sch. Bd. of Educ.*, 113 N.C. App. 579, 585, 440 S.E.2d 119, 123 (1994)).

83. Through the Motion to Compel, Plaintiffs requested that the Court (i) conduct an *in camera* review of the Challenged Claw-back Documents and all documents identified on WW's 2018 Logs to assess the propriety of WW's privilege assertions; (ii) determine whether counsel improperly instructed Ms. Vannoy not to answer deposition questions on the basis of privilege; (iii) compel WW to produce any non-privileged Challenged Claw-back Documents and any non-privileged documents identified on the 2018 Logs; and (iv) impose appropriate sanctions including, among other things, requiring Ms. Vannoy and other WW witnesses to sit for a further deposition concerning the documents WW improperly withheld or clawed back. Through the *In Camera* Review Order, the Court granted the Motion to Compel to the extent Plaintiffs sought an *in camera* review of the Challenged Claw-back Documents and Sample Log Documents (i.e., 10% of the documents identified on the 2018 Logs) and, with the parties' consent, the Court appointed the Master to conduct the review. The Court deferred further ruling on the issues raised in the Motion to Compel.

1. Exceptions

84.    Plaintiffs and WW separately assert exceptions to the Master's Report pursuant to Rule 53(g). Rule 53(g) provides, in relevant part, that "[a]ll or any part of the report may be excepted to by any party" and that the Court "may adopt, modify or reject the report in whole or in part, render judgment, or may remand the proceedings to the referee with instructions." N.C. R. Civ. P. 53(g)(2). The Court of Appeals has described the trial court's task under Rule 53(g) as follows:

> [When] exceptions are taken to a referee's findings of fact and law, it is the duty of the [trial] judge to consider the evidence and give his own opinion and conclusion, both upon the facts and the law. He is not permitted to do this in a perfunctory way, but he must deliberate and decide as in other cases—use his own faculties in ascertaining the truth and form his own judgment as to fact and law. This is required not only as a check upon the referee and a safeguard against any possible errors on his part, but because he cannot review the referee's findings in any other way.

*Bullock v. Tucker*, 822 S.E.2d 654, 659 (N.C. Ct. App. 2018) (quoting *Quate v. Caudle*, 95 N.C. App. 80, 83, 381 S.E.2d 842, 844 (1989)).

85.    WW takes exception to nearly every adverse finding and conclusion in the Master's Report. (*See* WW's Exceptions 6 n.8 ("Other than . . . eight documents . . . , [WW] except[s] to all of the Master's determinations that a Review Document (or portion thereof) is not privileged.").)

86.    As to the Sample Log Documents, WW takes exception to the Master's ruling that fifty-eight Sample Log Documents are not protected by the attorney-client privilege and/or work-product doctrine.[43] WW also asserts a general exception to the

---

[43] Of the fifty-eight Sample Log Documents at issue in WW's Exceptions, forty-two are the Identified Sample Log Documents addressed by WW's Sample Log Submission.

Master's conclusions that descriptions of many of the Sample Log Documents in the 2018 Logs were inaccurate and/or inadequate. For the reasons discussed below, the Court concludes that no less than 42 of the 150 Sample Log Documents (i.e., 28%) were improperly withheld or improperly redacted so as to deprive Plaintiffs of non-privileged information. The Court further concludes that a substantial majority of the Sample Log Document descriptions in the 2018 Logs are inadequate and, in numerous instances, inaccurate and misleading. The Court's specific findings and conclusions as to the Sample Log Documents are set forth in Appendix A to this Order and Opinion.

87. Both WW and Plaintiffs take exception to the Master's rulings as to certain Challenged Claw-back Documents: WW as to the Master's ruling that sixty-six Challenged Claw-back Documents are not privileged, and Plaintiffs as to the Master's finding that seventy-three of the Challenged Claw-back Documents may properly be considered privileged. As discussed above, however, the Court has concluded that WW has waived any claim of privilege as to the Challenged Claw-back Documents. Therefore, the Court concludes that the parties' Exceptions are moot to the extent they relate to the Master's findings and conclusions concerning the Challenged Claw-back Documents.[44] *See In re Hamilton*, 220 N.C. App. 350, 353, 725 S.E.2d 393, 396 (2012) (noting an issue is moot whenever "the relief sought has been granted or that

---

[44] While the Court need not rule on the parties' Exceptions to the Challenged Claw-back Documents, the Court has considered the parties' arguments in support of those Exceptions in evaluating the propriety of sanctions. As set forth more fully in Appendix B to this Order and Opinion, the Court has concluded that 122 of the 280 Challenged Claw-back Documents are neither privileged in whole or in part.

the questions originally in controversy between the parties are no longer at issue" (quoting *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978))).

88. The Court turns now to the merits of WW's privilege claims as to the Sample Log Documents. In the main, each Sample Log Document falls within one of three categories: (i) documents or communications involving business advice or intertwined legal and business advice; (ii) transmittal e-mails forwarding documents or communications either without comment or containing only "FYI" or words to similar effect; and (iii) draft documents. The Court addresses each category in turn.

2. Privilege in the Corporate Context

89. "Although it is generally accepted that corporations may assert the attorney-client privilege, applying the privilege in the corporate context 'presents special problems.'" *Technetics Grp. Daytona, Inc.*, 2018 NCBC LEXIS 116, at \*7 (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). One such problem arises when an attorney serves a corporation in more than one capacity. Here, many of the Sample Log Documents include communications involving WW's in-house counsel, Ms. Vannoy. Likewise, several Sample Log Documents include communications involving Mr. Vannoy, WW's outside counsel and Board member.

90. North Carolina law is clear that a "company and its counsel may not avail themselves of the protection afforded by the attorney-client privilege if the attorney was not acting as a legal advisor when the communication was made." *Evans*, 142 N.C. App. at 32, 541 S.E.2d at 791. As to in-house counsel specifically, this Court has noted as follows:

North Carolina courts apply the protection of the attorney-client privilege to in-house counsel in the same way that it is applied to other attorneys. A company and its in-house counsel may, however, only benefit from the protection of the attorney-client privilege if the attorney is functioning as a legal advisor when the communication occurs. A communication will not be deemed privileged merely because an in-house attorney was copied on the communication or forwarded a copy of a document. When the in-house counsel's legal advice is merely incidental to business advice, the privilege does not apply.

*Morris*, 2011 NCBC LEXIS 34, at *15 (first citing *Isom v. Bank of Am., N.A.*, 177 N.C. App. 406, 411, 628 S.E.2d 458, 462 (2006); and then citing *United States v. Cohn*, 303 F. Supp. 2d 672, 683 (D. Md. 2003)).

91.     "Business advice, such as financial advice or discussion concerning business negotiations, is not privileged." *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 517 (M.D.N.C. 1986); *cf. Isom*, 177 N.C. App. at 413, 628 S.E.2d at 463 ("[A]ny otherwise business emails, copied to an attorney, are not protected by the work product doctrine solely due to the fact they were sent during a time when the business is anticipating litigation."). When communications contain intertwined business and legal advice, courts consider whether the "primary purpose" of the communication was to seek or provide legal advice. *See, e.g., N.C. Elec. Membership Corp.*, 110 F.R.D. at 514. Thus, "[c]orporate documents prepared for simultaneous review by legal and nonlegal personnel are often held to be not privileged because they are not shown to be communications made for the primary purpose of seeking legal advice." *Id.*

92.     Another challenge in applying privilege in the corporate context arises in assessing (i) whether an attorney's communications with a particular employee or

agent of the corporation are privileged, and (ii) whether communications between non-attorney personnel reflect information that is privileged. *See Technetics Grp. Daytona, Inc.*, 2018 NCBC LEXIS 116, at *7 ("Given the variety of corporate roles and responsibilities, it is often a challenging task to decide who speaks for a corporation and whether that person's communications with corporate counsel are subject to the privilege."). Such questions are relevant here, as many of the Review Documents—and specifically most of the Sample Log Documents—were authored by or addressed to WW's officers and directors, as well as other WW employees and contractors, including Blackburn (outside accountant), Mathis (former in-house accountant), Amy Gregory ("Gregory") (former market development coordinator and current paralegal), and Todd Woods ("Woods") (former director of marketing and market development).

93. While "North Carolina appellate courts have not yet decided what test should apply as to the corporate attorney-client privilege[,]" the "mere fact that an employee is the company's 'agent' in some respects does not necessarily require that a communication involving that employee be found privileged." *Brown v. Am. Partners Fed. Credit Union*, 183 N.C. App. 529, 536, 645 S.E.2d 117, 122–23 (2007); *see Technetics Grp. Daytona, Inc.*, 2018 NCBC LEXIS 116, at *7 (describing North Carolina law as "particularly unsettled" and noting that few cases address "whether and to what extent the privilege covers communications between counsel and lower-level employees" or independent contractors).

94. Courts have recognized that "a communication by a non-attorney may in some instances reflect legal advice of an attorney." *Veolia Water Sols. & Techs. Support v. Siemens Indus., Inc.*, 63 F. Supp. 3d 558, 567 (E.D.N.C. 2014). For example, documents "subject to the privilege may be transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately." *Id.* (quoting *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993)). "In addition, documents subject to the privilege may be transmitted between non-attorneys to relay information requested by attorneys." *Id.* (quotation marks omitted); *see Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 72 (S.D.N.Y. 2010) ("[C]ommunications among non-attorneys in a corporation may be privileged if made at the direction of counsel, to gather information to aid counsel in providing legal services." (quoting *In re Rivastigmine Patent Litig. (MDL No. 1661)*, 237 F.R.D. 69, 80 (S.D.N.Y. 2006))).

95. Applying these principles to the Review Documents—and specifically the Sample Log Documents at issue in the parties' Exceptions—the Court concludes that a number of the Sample Log Documents include non-privileged business communications or records and were thus improperly withheld by WW, as set forth more fully in Appendix A to this Order and Opinion.

### 3. Transmittal E-mails

96. A number of the Sample Log Documents are transmittal e-mails forwarding documents or communications either without comment or containing only "FYI" or

words to similar effect. No less than twenty-three of the Sample Log Documents include non-substantive transmittal e-mails to or from Ms. Vannoy.[45]

97. This Court has noted that "[a] communication will not be deemed privileged merely because an in-house attorney was . . . forwarded a copy of a document." *Morris*, 2011 NCBC LEXIS 34, at *15 (citing *Isom*, 177 N.C. App. at 411, 628 S.E.2d at 462). Moreover, numerous courts have concluded that non-substantive transmittal communications to or from counsel are generally not protected. *See, e.g.*, *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d 1230, 1250 (D. Or. 2017); *FTC v. Innovative Designs, Inc.*, No. 16-1669, 2017 U.S. Dist. LEXIS 162222, at *16 (W.D. Pa. Sept. 28, 2017); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 104 (S.D.N.Y. 2017) ("[M]any of the documents are merely transmittal letters or emails that enclose or attach other documents. These 'cover' communications neither furnish nor request legal advice and do not reveal any privileged communications. These documents consequently cannot be withheld from discovery merely because they were sent to or from counsel."); *Arfa v. Zionist Org. of Am.*, No. CV 13-2942 ABC (SS), 2014 U.S. Dist. LEXIS 26970, at *19 (C.D. Cal. Mar. 3, 2014); *In re Bisphenol-A (BPA), Polycarbonate Plastic Prods. Liab. Litig.*, No. 08-1967-MD-W-ODS, 2011 U.S. Dist. LEXIS 34202, at *40 (W.D. Mo. Mar. 25, 2011) ("An attorney's statement that an unprivileged document is being provided 'FYI' is not

---

[45] The following Sample Log Documents include non-substantive transmittal e-mails: 30, 32, 59, 61, 62, 63, 80, 83, 84, 87, 91, 104, 109, 110, 111, 113, 122, 127, 130, 133, 135, 136, and 142. As an example, Sample Log Document No. 135 consists of three e-mails. The first two in time are non-privileged third-party communications. The third, most recent, e-mail is one in which Deem forwarded the prior two e-mails to Ms. Vannoy, adding only "FYI." WW improperly redacted Deem's "FYI" e-mail to Ms. Vannoy.

legal advice."); *Sokol v. Wyeth, Inc.*, No. 07-CV-8442 (SHS) (KNF), 2008 U.S. Dist. LEXIS 60976, at *27–28 (S.D.N.Y. Aug. 4, 2008) (noting that claiming privilege as to an e-mail containing only "FYI" is "frivolous, because no basis exists for asserting the attorney-client privilege for this type of communication"); *Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*, No. S-05-0583 LKK GGH, 2006 U.S. Dist. LEXIS 59066, at *6 (E.D. Cal. Aug. 7, 2006) ("[T]he dissemination of information to the lawyer must indicate that the lawyer is being addressed so that advice can be formulated or action taken, not simply for FYI reasons - or worse yet, simply because the lawyer must be added in order to make a non-privileged document assertedly privileged."); *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 143 F.R.D. 611, 615 (E.D.N.C. 1992) (concluding "[t]ransmittal letters . . . devoid of legal advice or requests for such advice and disclosing no privileged matters" are not protected); *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 145 (D. Del. 1977).

98.     WW argues, however, that forwarding e-mails devoid of original substance are nonetheless privileged because to "allow[] otherwise enables an adversary to discern what the lawyer and client communicated about."   (WW's Sample Log Submission 4.)  WW primarily relies upon the Court of Appeals' decision in *Brown v. Am. Partners Fed. Credit Union*, 183 N.C. App. 529, 645 S.E.2d 117 (2007), to support its position.  In *Brown*, the Court of Appeals assessed a claim of privilege as to a "letter with attachments" from a company's CEO to the company's outside attorney conveying information "material to the [bankruptcy] matter [for] which [the attorney] had been retained."  *Id.* at 537–38, 645 S.E.2d at 123–24.  After noting that "the

attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable counsel to give sound and informed advice[,]" the court concluded that "it would be manifestly unreasonable to require the [company] to disclose . . . what information it felt that its lawyer should have in advising it." *Id.* at 538, 645 S.E.2d at 124 (quotation marks omitted).

99. *Brown* does not, as WW suggests, stand for the general proposition that all information forwarded by or to a lawyer is automatically protected by the attorney-client privilege. *See Sessions*, 248 N.C. App. at 386, 789 S.E.2d at 857 (holding party failed to show that subject lines of e-mails exchanged with attorneys were privileged); *Isom*, 177 N.C. App. at 412, 628 S.E.2d at 462 (noting that e-mail from attorney to client "requesting a meeting" would not generally be protected); *Evans*, 142 N.C. App. at 32, 541 S.E.2d at 791. The letter at issue in *Brown* contained multiple paragraphs written by the client and relayed substantive information material to the matter upon which the outside attorney was retained. Here, by contrast, the transmittal e-mails to and from WW's in-house counsel, Ms. Vannoy, are either devoid of original substance or state only "FYI" or words to similar effect and contain neither a request for legal advice nor legal advice itself. As such, the Court finds *Brown* to have little application to the issue presented here.[46]

---

[46] WW also cites authority from other jurisdictions to support its position that its forwarding e-mails here should be deemed privileged. *See, e.g.*, *Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 238, 241 (E.D. Pa. 2008) ("A situation may arise where a number of email messages, by themselves not privileged, but eventually sent to an attorney for the purpose of securing legal advice, become privileged. . . . On the other hand, if the email messages are part of routine business affairs, and not for the purpose of securing legal advice,

100. Accordingly, the Court concludes that the approach taken by the majority of courts is sound and that, if faced with this issue, North Carolina's appellate courts would likely conclude that transmittal or forwarding e-mails that are devoid of legal advice or express or implied requests for such advice—and that do not otherwise reveal privileged information—are not protected by the attorney-client privilege. *See Miller*, 357 N.C. at 328–29, 584 S.E.2d at 782; *Sessions*, 248 N.C. App. at 386, 789 S.E.2d at 857; *Isom*, 177 N.C. App. at 412, 628 S.E.2d at 462; *Evans*, 142 N.C. App. at 32, 541 S.E.2d at 791 ("The mere fact that the evidence relates to communications between attorney and client alone does not require its exclusion.").

101. As set forth more fully in Appendix A, the Court concludes that WW improperly withheld, at least in part, twenty-three Sample Log Documents (Nos. 30, 32, 59, 61, 62, 63, 80, 83, 84, 87, 91, 104, 109, 110, 111, 113, 122, 127, 130, 133, 135, 136, and 142) containing transmittal e-mails sent to or from Ms. Vannoy either without comment or containing only "FYI" or words to similar effect.

4. Draft Documents

102. Several of the Sample Log Documents are lawyer-created draft documents and draft documents provided to WW's counsel that appear to have been intended for

---

then the underlying emails would be discoverable."); *Muro v. Target Corp.*, 250 F.R.D. 350, 363 (N.D. Ill. 2007) ("[E]ven though one e-mail is not privileged, a second e-mail which forwards that prior e-mail to counsel might be privileged in its entirety. In this respect, the forwarded material is similar to prior conversations or documents that are quoted verbatim in a letter to a party's attorney.") While the Court does not disagree that forwarding e-mails may be privileged in appropriate circumstances, none of those circumstances are present here, where the e-mails at issue are devoid of legal advice or express or implied requests for such advice and do not otherwise reveal privileged information.

disclosure to third parties.[47]  The parties do not cite, and the Court's research has not disclosed, any North Carolina appellate decisions considering whether, or the extent to which, draft documents intended to be released to third parties are privileged.

103. It is well settled that the attorney-client privilege extends only to confidential communications.  *Miller*, 357 N.C. at 328–29, 584 S.E.2d at 782.  Thus, the "privilege is waived when the client discloses privileged information to a third party."  *Sessions*, 248 N.C. App. at 383, 789 S.E.2d at 855.  Moreover, a "communication *intended to be disclosed* to a third party is not confidential." *Marina Food Assocs., Inc. v. Marina Rest., Inc.*, 100 N.C. App. 82, 89, 394 S.E.2d 824, 828 (1990) (emphasis added) (citing 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 62 (3d ed. 1988)); *see State v. Locklear*, 291 N.C. 598, 603, 231 S.E.2d 256, 259 (1977); *Dobias v. White*, 240 N.C. 680, 684–85, 83 S.E.2d 785, 788 (1954) ("If it appears by extraneous evidence or from the nature of a transaction or communication that [attorney-client communications] were not regarded as confidential, or *that they were made for the purpose of being conveyed by the attorney to others*, they are stripped of the idea of a confidential disclosure and are not privileged." (emphasis added) (citation omitted)); *State v. Watkins*, 195 N.C. App. 215, 223, 672 S.E.2d 43, 49 (2009) ("[B]ecause defendant provided the . . . information to [his attorney] precisely for the purpose of conveying it to the prosecutor, that conversation was not a 'confidential' communication to which the attorney-client privilege attached.").  This Court has noted in dicta that "drafts of potential [contracts] prepared by counsel for client

---

[47]  Specifically, Sample Log Document Nos. 3, 5, 11, 16, 17, 31, and 53.

review would be privileged up to the point at which they were intended to be given" to a third party. *Morris*, 2011 NCBC LEXIS 34, at \*21–22.

104. Federal court decisions provide further guidance, and one federal court has recently noted that "[t]here is disagreement among courts as to the circumstances under which draft . . . documents that will eventually be disclosed to third parties are privileged." *In re Intuniv Antitrust Litig.*, No. 16-cv-12653-ADB, 2018 U.S. Dist. LEXIS 207545, at \*25 (D. Mass. Dec. 10, 2018) (citing 1 *McCormick on Evidence* § 91 (7th ed. 2016)).

105. Under Fourth Circuit precedent, "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as the details underlying the data which was to be published will not enjoy the privilege." *United States v. (Under Seal) (In re Grand Jury 83-2 John Doe No. 462)*, 748 F.2d 871, 875 (4th Cir. 1984) (quotation marks omitted). Courts applying this approach focus on whether the client demonstrated the "requisite intent to publish," which may be found even when a final draft of the document is not in fact made public. *United States v. Under Seal (In re Grand Jury Subpoena)*, 204 F.3d 516, 521 (4th Cir. 2000); *see Republican Party v. Martin*, 136 F.R.D. 421, 428 (E.D.N.C. 1991) ("Preliminary drafts of letters or documents which are to be published to third parties lack confidentiality." (quoting *N.C. Elec. Membership Corp.*, 110 F.R.D. at 517)).

106. Other courts are more protective of draft documents and hold that the attorney-client privilege "applies to all information conveyed by clients to their

attorneys for the purpose of drafting documents to be disclosed to third persons and all documents reflecting such information, to the extent that such information is not contained in the document published and is not otherwise disclosed to third persons." *Schenet v. Anderson*, 678 F. Supp. 1280, 1283 (E.D. Mich. 1988). Thus, as to preliminary drafts of documents, the "privilege is waived only as to those portions of the preliminary drafts ultimately revealed to third parties." *Id.* at 1282–84; *see United States v. Schlegel*, 313 F. Supp. 177, 179 (D. Neb. 1970) ("[W]hatever is finally sent to the [third party] is what matches the client's intent."). Stated differently, "only the portions of the draft that are ultimately disclosed in the final document are subject to disclosure." *In re N.Y. Renu with Moistureloc Prod. Liab. Litig.*, No. 766,000/2007, 2008 U.S. Dist. LEXIS 88515, at *17 (D.S.C. May 6, 2008). This approach has been adopted by the "majority of courts that have addressed whether draft documents intended to be released to the public are privileged." *Nanticoke Lenni-Lenape Tribal Nation v. Porrino*, No. 15-5645 (RMB/JS), 2017 U.S. Dist. LEXIS 151410, at *24–25 (D.N.J. Sept. 19, 2017).

107. The Court agrees with the approach taken by the majority of federal courts, which is consistent with this Court's dicta in *Morris*, and concludes that, if faced with this issue, our appellate courts would likely conclude that the only portions of a draft document subject to disclosure are those that are ultimately disclosed to a third party. This rule furthers the purpose of the attorney-client privilege by encouraging "full and frank" disclosure of information by the client to the attorney and is consistent with the purposes of the privilege. *Miller*, 357 N.C. at 328–29, 584 S.E.2d at 782.

This rule is also preferable to the Fourth Circuit's alternative approach because, as this Court has noted, it is inherently difficult to "determine the time at which a document drafted by counsel for client approval ha[s] reached the stage at which the intent of confidentiality came to an end." *Morris*, 2011 NCBC LEXIS 34, at *21–22. Under either approach, however, documents that are adopted as written and published to third parties are no longer protected from disclosure under the attorney-client privilege.

108. The Court thus applies these principles to the Sample Log Documents at issue and reaches the following conclusions.

109. Sample Log Document Nos. 3 and 5 were improperly withheld on the basis of the attorney-client privilege, as the accompanying "family" documents (i.e., e-mails) suggest that Sample Log Document Nos. 3 and 5 were final drafts intended to be adopted as written and published to third parties. WW offers no evidence to the contrary.

110. Sample Log Document No. 11, a draft agreement, was properly withheld, as the contents of that document were never ultimately disclosed. (*See* B. Vannoy Aff. ¶ 6, ECF No. 693.)

111. Sample Log Document Nos. 16 and 17, each of which is a draft FDD, are not privileged to the extent that the information contained therein was published in a final FDD or otherwise disclosed to third parties. While WW has failed to offer evidence to suggest that changes were made to Sample Log Document Nos. 16 and 17 prior to publication, the Court will allow WW the opportunity to redact the portions

that were not ultimately disclosed, if any.

112. Sample Log Document No. 31, a draft letter to a non-plaintiff store owner, is not privileged, because (i) it does not convey legal advice, (ii) it was drafted by a non-lawyer WW employee, and (iii) WW offers no evidence to suggest that it was not adopted as written.

113. Sample Log Document No. 53, a draft agreement with a third party, is not privileged to the extent it was subsequently published to third parties. While WW has failed to offer evidence to suggest that changes were made to Sample Log Document No. 53 prior to publication, the Court will allow WW the opportunity to redact the portions that were not ultimately disclosed, if any.

### 5. Privilege Logs

114. Turning next to WW's 2018 Logs, the Court finds WW's Logs to be deficient in many respects, including the following: (i) many document descriptions omit critical details that were properly included in the prior versions of WW's Logs; (ii) many descriptions are wholly inadequate and, on numerous occasions, inaccurate; (iii) WW unduly delayed serving the 2018 Logs until fourteen months after WW acknowledged that its 2017 Logs were incomplete; and (iv) WW failed to timely claim work-product protection for many documents that WW now claims are protected by work-product immunity. The Court will address each of these deficiencies below.

### a. Logs: Revisions

115. As an initial matter, the Court is troubled that WW chose to re-write nearly every document description when it prepared its 2018 Logs to remove critical details

that were properly included in the prior versions of its Logs. For the most part, WW's 2017 Logs provided reasonable detail in describing withheld documents. The same is not true of the 2018 Logs. Of the 80 Sample Log Documents that were included in the 2017 Logs, the descriptions as to 73 (i.e., 91.3%) were revised in the 2018 Logs to omit important factual details. As an example, while the 2017 Logs described Sample Log Document No. 2 (a May 2010 e-mail from Deem to Ms. Vannoy) as e-mail correspondence "between members of [WW] Corporate and Beth Vannoy, as corporate counsel, regarding information needed for FDD," the 2018 Logs vaguely describe the very same document as e-mail "correspondence between members of [WW] Corporate and Beth Vannoy, as corporate counsel, regarding data gathering with respect to potential compliance issues."

116. WW's explanation for the changed document descriptions is unpersuasive. WW's counsel avers that, in preparing the 2018 Logs, counsel "manually drafted descriptions for all entries that used uniform and consistent language" and "*[o]ne reason* for the changed descriptions is that different attorneys were involved in drafting the 2018 [L]ogs from those created previously." (Goode Aff. ¶ 41 (emphasis added).) Tellingly, WW does not identify any other reason it expended time and effort to remove more specific descriptive detail from the 2018 Logs.

### b. Logs: Adequacy and Accuracy of Descriptions

117. The Court separately concludes that a substantial majority of the document descriptions in the 2018 Logs are inadequate and, on numerous occasions, inaccurate.

118. Under Rule 26(b)(5)(A) of the North Carolina Rules of Civil Procedure, a party objecting to the production of documents on the grounds of attorney-client privilege or work-product immunity "must (i) expressly make the claim and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed, and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." N.C. R. Civ. P. 26(b)(5)(A). While our appellate courts have not had occasion to meaningfully interpret North Carolina Rule 26(b)(5)(A), under the identically worded Federal Rule of Civil Procedure 26(b)(5)(A), "[a] party can sustain [its] burden through a properly prepared privilege log that identifies each document withheld, and contains information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's general subject matter."[48] *Johnson v. Ford Motor Co.*, 309 F.R.D. 226, 232 (S.D. W. Va. 2015).[49] Federal courts have also concluded that "[a] party's conclusory assertion that a document is privileged is inadequate to meet the burden imposed by Rule 26(b)(5)(A)." *Id.*; *see Nucap Indus., Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 U.S. Dist. LEXIS 135288, at *5 (N.D.

---

[48] The CMO in these actions similarly provides that the parties' privilege logs must "include[], at a minimum, the following information about each disputed document: the Bates numbers, the date, the type, the subject matter, the page numbers, the author, the recipients, including people or entities receiving carbon copies, and the privilege asserted over the document." (Case Management Order 7, ECF No. 50.)

[49] Because "[t]he North Carolina Rules of Civil Procedure are, for the most part, verbatim recitations of the federal rules," our courts have recognized that "[d]ecisions under the federal rules are thus pertinent for guidance and enlightenment in developing the philosophy of the North Carolina rules." *Turner v. Duke Univ.*, 325 N.C. 152, 164, 381 S.E.2d 706, 713 (1989).

Ill. Aug. 23, 2017) (finding privilege log description reading "[c]ommunication reflecting legal advice regarding anticipated litigation" to be inadequate).

119. Similarly, describing a document as "regarding" or "related to" "legal advice" is of no more assistance to a party seeking to test a privilege claim than generally asserting that the document is protected by the attorney-client privilege. *See, e.g.*, *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (N.D. Ill. 2013) (finding a "vague and generic description" did not allow court to assess privilege claim); *see also Bhasker v. Fin. Indem. Co.*, No. CIV 17-260 JB/JHR, 2018 U.S. Dist. LEXIS 172114, at *27 (D.N.M. Oct. 3, 2018) ("Defendant's privilege log states, extremely generally, 'claim note entry reflecting legal advice[.]' . . . [T]he Court finds that even if the attorney-client or work product doctrines applied, Defendant has waived them by failing to produce an adequate privilege log."); *Mold-Masters Ltd. v. Husky Injection Molding Sys., Ltd.*, No. 01 C 1576, 2001 U.S. Dist. LEXIS 20152, at *7–8 (N.D. Ill. Dec. 5, 2001) ("If the description . . . fails to provide sufficient information for the court and the party seeking disclosure to assess the applicability of the attorney-client privilege or work-product doctrine, then disclosure of the document is an appropriate sanction.").

120. Applying these principles here, and based on the Court's independent review, the Court agrees with the Special Master that the overwhelming majority of WW's descriptions in the 2018 Logs are inadequate. The Master reasonably concluded, and WW does not dispute, that of the 150 Sample Log Document descriptions, (i) at least 95 "describe an email or draft as either regarding or relating

to 'legal advice'" and are thus "wholly inadequate in affording [Plaintiffs] a fair opportunity to assess the validity of the privilege claim," and (ii) at least 30 "merely describe the document as a 'draft'" and "fail[] to identify the subject matter of the communication." (Master's Rpt. 21.) In total, the Master fairly concluded that only four descriptions "provide sufficient detail of the subject matter of the [Sample Log Document] to arguably permit an assessment as to why the privilege applies." (Master's Rpt. 21.) The Master further concluded, and the Court agrees, that over half of the Sample Log Document descriptions were "inaccurate." (Master's Rpt. 21.)

121. An illustrative example is instructive. In the 2018 Logs, WW describes Sample Log Document No. 12, a document WW withheld from production, as a "[d]ocument drafted by Todd Woods at Beth Vannoy's direction." Not only does this description fail to identify the subject matter of the document, it does not reflect that the document relates to legal advice. The description is also inaccurate, as made plain by Ms. Vannoy's own testimony: "I did not instruct Mr. Woods to create this spreadsheet[.]" (*See* B. Vannoy Aff. ¶ 7.) Although WW now rightly concedes— through its Sample Log Submission—that the vast majority of the information on Sample Log Document No. 12 is not privileged and should have been produced in the first instance, Plaintiffs could hardly have known to test WW's privilege assertion based on WW's document description. It should go without saying that a party may not withhold documents on baseless privilege grounds, describe the withheld document in broad and inaccurate ways, and agree to produce the improperly withheld documents only after an *in camera* review is underway.

122. Moreover, WW's defense of its 2018 Log descriptions is singularly unpersuasive. Although stating that it is "prepared to address any deficiencies in its privilege logs that the Court finds," WW contends that its Logs are adequate because "Plaintiffs logged documents over which they claimed privilege with similar (or even less) specificity." (WW's Exceptions 26.) WW relies on the sometimes-accepted proposition that "[w]hat is good for the goose is good for the gander," *In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2013 U.S. Dist. LEXIS 64150, at *10 (S.D.N.Y. Apr. 24, 2013), and argues that "it is manifestly unfair to hold WW to a higher standard," (WW's Exceptions 26). That maxim provides little justification for WW's descriptions here, however, where the substantial majority of the withheld documents involve communications that include Ms. Vannoy, who simultaneously provided legal and business advice in her role as WW's in-house counsel, and/or Mr. Vannoy, who acted similarly in his role as WW's outside counsel and board member. No persons involved in communications with or on behalf of any of the Plaintiffs performed dual business and legal functions, so there is no "goose" for WW's attempted "gander." Indeed, the only privileged communications Plaintiffs logged were those with outside counsel. In contrast, WW did not log its own communications with outside litigation counsel regarding these actions, (JFB 8), a further basis to reject WW's attempted comparison to Plaintiffs.

123. WW also seeks to defend its 2018 Logs by asserting that Plaintiffs have not been prejudiced by the 2018 Logs' inadequate and/or inaccurate descriptions. WW's "no prejudice" contention is without factual support. WW's first argument—that

Plaintiffs have not been prejudiced because they have access to WW's more detailed 2017 Logs—ignores that only 80 of the 150 Sample Log Documents were included in the 2017 Logs. Likewise, WW's second argument—that Plaintiffs have not been prejudiced because they "refus[ed] to sequester" the Challenged Claw-back Documents and "continue to view and have access" to them, (WW's Exceptions 27)—ignores that Plaintiffs must rely on WW's inadequate and inaccurate descriptions of the Sample Log Documents and other documents withheld from production because they do not have access to them. In any event, the law is clear that Plaintiffs need not show prejudice to be entitled to sanctions for WW's conduct. *See Out of the Box Developers, LLC v. LogicBit Corp.*, 2014 NCBC LEXIS 7, at *8 (N.C. Super. Ct. Mar. 20, 2014) ("[T]he party seeking Rule 37 sanctions need not show prejudice resulting from the sanctionable conduct.").

c. Logs: WW's Exceptions

124. Through WW's Exceptions, WW asserts a general objection to the Master's conclusions that the document descriptions in its 2018 Logs were inaccurate and/or inadequate.

125. According to WW, the Special Master's "decisions appear to have been plagued by a misunderstanding of the redactions employed, because he noted that WW failed to describe portions of Review Documents that WW did not withhold." (WW's Exceptions 26.) WW cites only three of the Master's conclusions (Sample Log Document Nos. 126, 128, and 138) as examples. (WW's Exceptions 26.) As to these three documents and their corresponding descriptions in the 2018 Logs, the Court

agrees that the Master erred to the extent that he faulted WW for not describing the non-redacted portions of those documents.

126. Next, WW contends that, "[o]n a few occasions," the Master's conclusions were "based on a misunderstanding of the facts and lack of context surrounding the invocations of the privilege[,]" citing only Sample Log Document No. 36 as an example. (WW's Exceptions 26 n.12.) The 2017 Logs (i) describe Sample Log Document No. 36 as a "[s]preadsheet of financial information maintained by [WW] at Beth Vannoy's direction," (ii) identify the date as April 12, 2010, (iii) identify Amy Gregory as the author, and (iv) do not identify a recipient. In sharp contrast, however, the 2018 Logs, which were reviewed by the Master, (i) describe Sample Log Document No. 36 as a "[s]preadsheet of financial information maintained at Beth Vannoy's direction and provided to Randy Blackburn at request of outside counsel with request for legal advice," (ii) identify the date as May 8, 2013, (iii) identify Mathis as the author, and (iv) identify Ms. Vannoy as the recipient. The "family" documents accompanying Sample Log Document No. 36 show that the 2018 Logs erroneously identify Ms. Vannoy as the recipient and suggest that the document was provided to Blackburn with a "request for legal advice" when it was not. Further, WW offers no evidence to suggest that Sample Log Document No. 36 was maintained at Ms. Vannoy's direction. (*Cf.* B. Vannoy Aff. ¶ 11; Mathis Aff. ¶ 2, ECF No. 696; Taylor Aff. ¶ 2, ECF No. 694.) Thus, Sample Log Document No. 36 should not have been reflected on WW's Logs at all because WW has failed to show that it is privileged. In any event, the Master's conclusion that the 2018 Logs' description of Sample Log

Document No. 36 is "particularly contrived and misleading" is fully supported by the record.

127. Other than these four examples, WW does not identify the specific findings and conclusions to which it excepts. Without specific objections, the Court need not specifically assess whether any of the Master's other conclusions were based upon an alleged misunderstanding of the facts. *See Wilson Ford Tractor, Inc. v. Massey-Ferguson, Inc.*, 105 N.C. App. 570, 575, 414 S.E.2d 43, 46 (1992) ("Exceptions must specifically identify an alleged error."); *Bullock*, 822 S.E.2d at 659 ("[W]here a party perfunctorily excepts to a referee's report 'in its entirety' and fails to specifically except to any finding, a trial court need not review the evidentiary sufficiency of the referee's findings."); 2 G. Gray Wilson, North Carolina Civil Procedure § 53-10 (2018) ("An exception to a report must be specific and definite, whether it is directed to the admission of evidence or findings and conclusions therein."); *see also Anderson v. McRae*, 211 N.C. 197, 198, 189 S.E. 639, 640 (1937) ("[I]n the absence of exceptions to the factual findings of a referee, such findings are conclusive, and where no exceptions are filed, the case is to be determined upon the facts as found by the referee." (citations omitted)). Nonetheless, based on the Court's review of the Sample Log Documents and corresponding descriptions in the 2018 Logs, the Court agrees with the Master's conclusion that WW's document descriptions in its 2018 Logs were generally inaccurate and/or inadequate.

d. <u>Logs: Fourteen-Month Delay</u>

128. Not only were WW's 2018 Logs substantively deficient, they were also untimely under the Court's CMO. Under that order, a party objecting to the production of documents on the grounds of attorney-client privilege or work-product immunity is required to serve a privilege log "contemporaneously with its objection[.]" (Case Management Order 7, ECF No. 50); *see Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 99–100 (W.D.N.Y. 2011) (holding defendants' failure to timely serve privilege log waived any privilege that might otherwise be asserted). WW failed to contemporaneously serve its Logs here.

129. Moreover, as early as February 2017, WW acknowledged that its 2017 Logs were incomplete and in need of amendment. On February 14, 2017, WW's counsel informed Plaintiffs' counsel that WW would update its Logs "in the coming weeks to include additional documents." (Pls.' Br. Supp. Mot. Compel Ex. G, ECF No. 449.8.) WW failed to update its Logs within that timeframe. Later, on June 7, 2017, WW's counsel again promised to provide Plaintiffs with updated Logs, this time by no later than June 30, 2017. (Goode Aff. ¶ 40.) Again, WW failed to follow through with its promised supplementation. Indeed, it was not until April 13, 2018 that WW provided Plaintiffs with its supplemented Logs (i.e., the deficient 2018 Logs). These updated Logs were provided to Plaintiffs contemporaneously with notice of the 2018 Claw-back just before key WW depositions were scheduled to occur. WW's only excuse for the fourteen-month delay is counsel's "extensive work in this litigation," (Goode Aff.

¶ 40), an excuse the Court cannot credit given the importance of the privilege assertions to the discovery then remaining to be completed.

### e. Logs: Failure to Expressly Invoke Work-Product Immunity

130. In its 2018 Logs, WW claimed work-product protection for two Challenged Claw-back Documents and seven Sample Log Documents.[50] In WW's Exceptions and Sample Log Submission, however, WW asserts work-product immunity to protect from production an additional twenty-two Sample Log Documents and eighteen Challenged Claw-back Documents for which WW declined to claim work-product immunity in the 2018 Logs.[51] Plaintiffs argue that WW cannot now—after the Court's *in camera* review—argue for the first time that certain documents are protected as work product. The Court agrees.

131. When a party withholds otherwise discoverable information by claiming the information is privileged or subject to protection under the work-product doctrine, the burden lies with that party to "expressly make the claim[.]'" N.C. R. Civ. P. 26(b)(5)(A); *see Sessions*, 248 N.C. App. at 382, 789 S.E.2d at 854. A failure to timely make the claim waives the privilege or work-product immunity. *See Stoffels v. SBC Commc'ns, Inc.*, 263 F.R.D. 406, 412 (W.D. Tex. 2009). Similarly, a party cannot timely claim that a document is protected by the attorney-client privilege and later claim work-product immunity long after the initial objection is lodged. *See, e.g.*,

---

[50] Challenged Claw-back Document Nos. 20 and 223 and Sample Log Document Nos. 36, 49, 50, 51, 53, 60, and 64.

[51] Sample Log Document Nos. 11, 19, 29, 35, 40, 42, 43, 45, 59, 61, 62, 72, 91, 110, 111, 113, 121, 122, 127, 133, 143, and 146. Challenged Claw-back Document Nos. 5, 187, 240, 246, 247, 248, 249, 250, 252, 254, 255, 257, 270, 276, 277, 278, 280, and 281.

*Sherwood v. BNSF Ry. Co.*, 325 F.R.D. 652, 662–63 (D. Idaho 2018); *Stoffels*, 263 F.R.D. at 412 ("To the extent defendants failed to expressly assert the claim of attorney work product protection for these documents until two years after defendants initially withheld this information, defendants have waived this claim."); *Carte Blanche PTE., Ltd. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y. 1990) (concluding that party waived work-product immunity by "failing to specify work product as the particular [basis for] protecting" the documents). This is especially true where, as here, the work-product objection was not made until after the Court's *in camera* review of the documents.

132. Accordingly, the Court concludes, in the exercise of its discretion, that by failing to timely assert work-product protection for the twenty-two Sample Log Documents and eighteen Challenged Claw-back Documents it now seeks to protect from production on that ground, WW has waived its claim for work-product immunity as to these documents.

### 6. Production of Non-privileged Documents

133. As set forth more fully in Appendix A to this Order and Opinion, the Court concludes that forty-two of the 150 Sample Log Documents (i.e., 28%) were improperly withheld in whole or in part. Because those documents (or portions thereof) are not in fact privileged, Plaintiffs' Motion to Compel shall be granted to the extent Plaintiffs seek an order compelling WW to produce those documents.

134. As noted, the Court limited its *in camera* review to the Sample Log Documents (i.e., a randomly selected group of 150 of the roughly 1,500 documents

identified in WW's 2018 Logs).  The Court has concluded that approximately 28% of the 150 Sample Log Documents reviewed were improperly withheld in whole or in part.  Given that WW's 2018 Logs include approximately 1,350 additional documents that WW withheld on the basis of privilege, it appears likely to the Court that a substantial number of those documents are not properly claimed as privileged.

135.   Although the Court may ultimately conclude that it must review some or all of the remaining documents, the Court will first require WW to re-review all the withheld documents in light of the Court's conclusions herein and produce all non-privileged documents currently withheld.  The Court shall also require WW to update its 2018 Logs to provide adequate and accurate document descriptions consistent with this Order and Opinion.[52]  WW shall complete the re-review and provide updated Logs within twenty days of the entry of this Order and Opinion.  The Court will consider a further *in camera* review for good cause shown in the event Plaintiffs reasonably conclude that WW has not met its obligations hereunder.

   7.   Sanctions

136.   Through their Motion to Compel, Plaintiffs seek sanctions against WW for its discovery misconduct pursuant to Rule 37 and under the Court's inherent authority.  Under Rule 37(a)(4), when a motion compelling discovery is granted, the court "shall require" the party resisting discovery "to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless

---

[52] In light of the substantial number of documents identified in WW's 2018 Logs, the Court declines to review all of the documents *in camera* at this time but will revisit this ruling for good cause shown after WW completes the further production and privilege log supplementation required hereunder.

the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." N.C. R. Civ. P. 37(a)(4). Because awarded expenses are required "to be reasonable, the record must contain findings of fact to support the award of any expenses, including attorney's fees." *Benfield v. Benfield*, 89 N.C. App. 415, 422, 366 S.E.2d 500, 504 (1988).

137.  In addition, Rule 37(b) permits a court to order a variety of sanctions against a party who fails to obey a court order regarding discovery. N.C. R. Civ. P. 37(b). Pursuant to Rule 37(b), a court may sanction a party for violating a Rule 26(c) protective order because "the orderly and efficient progression of litigation demands that the trial court be empowered to police violations" of its discovery orders. *Out of the Box Developers, LLC*, 2014 NCBC LEXIS 7, at *7; *see also Baker v. Charlotte Motor Speedway, Inc.*, 180 N.C. App. 296, 300–01, 636 S.E.2d 829, 832–33 (2006) (affirming order imposing Rule 37(b) sanctions against party for violating case management order).

138.  Moreover, trial courts retain inherent authority "to do all things that are reasonably necessary for the proper administration of justice."[53] *Beard v. N.C. State Bar*, 320 N.C. 126, 129, 357 S.E.2d 694, 696 (1987). This inherent authority includes the power to "impose sanctions for discovery abuses beyond those enumerated in Rule 37." *Cloer v. Smith*, 132 N.C. App. 569, 573, 512 S.E.2d 779, 782 (1999).

---

[53]  A court's "inherent authority encompasses not only the 'power but also the duty to discipline attorneys, who are officers of the court, for unprofessional conduct.' " *Couch v. Private Diagnostic Clinic*, 146 N.C. App. 658, 665–66, 554 S.E.2d 356, 362 (2001) (quoting *In re Hunoval*, 294 N.C. 740, 744, 247 S.E.2d 230, 233 (1977)).

139. The imposition of sanctions under Rule 37 or pursuant to a court's inherent authority is in the sound discretion of the trial judge and "will not be overturned absent a showing of abuse of discretion." *Id.* A trial court will only be held to have abused its discretion "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *E. Brooks Wilkins Family Med., P.A. v. WakeMed*, 244 N.C. App. 567, 578, 784 S.E.2d 178, 185 (2016) (quoting *Couch v. Private Diagnostic Clinic*, 146 N.C. App. 658, 667, 554 S.E.2d 356, 363 (2001)).

140. "North Carolina courts do not presently require the party requesting sanctions to demonstrate, as a part of its burden, that it suffered prejudice as a result of the opposing party's discovery failures or that the opposing party acted willfully." *Tumlin v. Tuggle Duggins P.A.*, 2018 NCBC LEXIS 51, at *31 (N.C. Super. Ct. May 22, 2018); *see Henderson v. Wachovia Bank of N.C., N.A.*, 145 N.C. App. 621, 629, 551 S.E.2d 464, 470 (2001). As this Court has recognized, however, "[w]illfulness, bad faith, or prejudice to another party" may influence the court's discretion "in determining the appropriate sanction." *Out of the Box Developers, LLC*, 2014 NCBC LEXIS 7, at *8.

141. Based on its careful review of the record, the Court concludes, in the exercise of its discretion, that WW's opposition to the Motion to Compel was not substantially justified and warrants the imposition of sanctions under Rule 37(a). Separately, the Court also concludes, in the exercise of its discretion and pursuant to Rule 37(b) and the Court's inherent authority, that sanctions are warranted because of WW's

numerous discovery abuses, all of which have been discussed above, including that WW (i) failed to produce a substantial number of non-privileged documents without legal justification; (ii) clawed back a substantial number of non-privileged documents on the eve of key depositions without legal justification; (iii) failed, for over fourteen months, to timely serve its 2018 Logs after acknowledging that its 2017 Logs were incomplete; and (iv) substantially revised the document descriptions in its 2018 Logs to remove information necessary to permit Plaintiffs to understand, evaluate, and challenge WW's assertions of privilege.

142. While the Court has concluded that WW waived privilege as to the Challenged Claw-back Documents based on its two-year delay in initiating the 2018 Claw-back, the Court has nevertheless evaluated the propriety of WW's claims of privilege for those documents to assist the Court in ruling on Plaintiffs' request for sanctions. As set forth more fully in Appendix B to this Order and Opinion, the Court finds that 122 of the 280 Challenged Claw-back Documents are not privileged in whole or in part. This fact further supports the imposition of sanctions.

143. That sanctions are warranted is further highlighted by the nature of many of the non-privileged Review Documents. For instance, WW improperly redacted Sample Log Document No. 122, an e-mail chain from August 2013 consisting of four e-mails, to omit relevant information that could not reasonably be considered privileged. The first two e-mails in time, which WW produced, were sent by employees of AMI (a WW vendor), including David King, to WW's Deem. In the

subsequent third e-mail, Deem forwarded the AMI e-mails to WW's Board and Ms. Vannoy, adding the following:

> I spoke with [David King] Friday evening and shared my anger. As you can clearly see on the attached spreadsheet, [Plaintiff Jim Roland] has our exact rebate structure by item thanks to AMI. [David King] stated that [Plaintiff Jim Roland] kept asking for more details and that is how the tabs expanded, but that is no excuse….. [David King] knew that *we did not want [Plaintiff Jim Roland] to have the exact details of our rebate.*[54]

Deem's e-mail is not privileged, yet WW redacted the e-mail on privilege grounds. Finally, in the fourth, most recent e-mail, which WW also redacted, Ms. Vannoy forwarded the prior three emails to WW's outside counsel, Taylor, without notation or comment. WW's privilege assertion as to Sample Log Document No. 122,[55] and on many other documents reflected in Appendix A, appear to be motivated more by perceived harm to WW's defense than faithful adherence to the law of privilege or the rules of discovery. As such, and for the numerous discovery abuses the Court has outlined above, the Court concludes that sanctions are appropriate.

144. The Court next considers appropriate sanctions for WW's discovery misconduct.

---

[54] While Sample Log Document No. 122 was not produced to Plaintiffs, the Court has no hesitation quoting Deem's e-mail, as that e-mail is also included in Challenged Claw-back Document No. 281 (a partial duplicate of Sample Log Document No. 122) and the italicized portion was quoted in Plaintiffs' brief in support of the Motion to Compel. (*See* Pls.' Br. Supp. Mot. Compel 10.)

[55] An allegation at the heart of Plaintiffs' claims is that WW hid the existence and amount of rebates WW received from vendors, including AMI.

### a. Plaintiffs' Reasonable Expenses

145. Plaintiffs request that WW be required to pay Plaintiffs' reasonable expenses incurred in bringing the Motion to Compel, including payment of Plaintiffs' reasonable attorneys' fees. For the reasons above, the Court concludes that WW's opposition to Plaintiffs' Motion to Compel was not substantially justified, nor do the circumstances of these cases make an award of expenses unjust. Accordingly, the Court concludes, in the exercise of its discretion and under the Court's authority pursuant to Rule 37(a)(4) and the Court's inherent authority, that the circumstances here warrant the entry of an order requiring WW to pay Plaintiffs' reasonable expenses, including reasonable attorneys' fees, incurred in (i) preparing and prosecuting the Privilege Motions; (ii) compensating the Special Master for his services;[56] (iii) seeking and obtaining the non-privileged Review Documents, including Plaintiffs' expenses incurred in identifying non-privileged documents, sending deficiency letters, engaging in meet and confer discussions, and complying with the BCR 10.9 process; and (iv) addressing deficiencies with WW's 2018 Logs. Plaintiffs may submit a petition to recover these expenses as provided in this Order and Opinion.

### b. Further Depositions

146. As a further sanction, Plaintiffs seek an order permitting a further deposition of Ms. Vannoy and other WW witnesses on the content of documents that

---

[56] By Order dated January 11, 2019, the Court ordered Plaintiffs and WW to pay the Master's fee in equal shares, noting that the Court would consider at a later date whether modification to the equal division was warranted. For the reasons stated herein, the Court concludes that WW shall be required to reimburse Plaintiffs for their share of the Master's fee.

were improperly withheld or clawed back on the basis of privilege.[57]  In light of the Court's conclusion that WW improperly withheld a substantial number of non-privileged documents and waived any claim of privilege as to the Challenged Claw-back Documents, the Court, in the exercise of its discretion and pursuant to its inherent authority, concludes that Plaintiffs shall have the opportunity to re-depose the following witnesses concerning the documents WW has been ordered to produce under this Order and Opinion: Ms. Vannoy, Mr. Vannoy, McBride, Mathis, Blackburn, and any other witness Plaintiffs may identify for good cause shown. Unless extended for good cause shown, each re-deposition ordered hereunder shall be limited to seven hours of on-the-record examination.[58]  WW shall bear the costs of each deposition ordered hereunder.

### c.  Waiver as to Challenged Claw-back Documents

147.  The Court further concludes, in the exercise of its discretion, pursuant to its inherent authority and Rule 37, and after considering lesser sanctions, that a limited waiver of the attorney-client privilege is an appropriate sanction for WW's discovery misconduct.  *See Westdale Recap Props., Ltd. v. NP/I&G Wakefield Commons, L.L.C.*, No. 5:11-CV-659-D, 2013 U.S. Dist. LEXIS 138537, at *11–12 (E.D.N.C. Sep. 26,

---

[57]  Through their Motion to Compel, Plaintiffs also requested that the Court review Ms. Vannoy's deposition transcript to determine whether WW's counsel improperly instructed Ms. Vannoy not to answer deposition questions on the basis of privilege.  Because Plaintiffs shall have the opportunity to further depose Ms. Vannoy, the Court concludes that it need not make rulings concerning instructions given at Ms. Vannoy's prior deposition.

[58]  "[T]he purpose of a pre-trial deposition is to test the allegations made in the pleadings *under penalty of perjury* and to obtain additional details that may undermine those allegations." *Lovendahl v. Wicker*, 208 N.C. App. 193, 208, 702 S.E.2d 529, 539 (2010) (emphasis added).

2013) ("Failure to timely serve a privilege log meeting the requirements of Rule 26(b)(5)(A) may be deemed a waiver of the privilege otherwise claimed."); *Cappetta v. GC Servs. Ltd. P'ship*, No. 3:08CV288, 2008 U.S. Dist. LEXIS 103902, at \*13 (E.D. Va. Dec. 24, 2008) ("Where a [party] has taken no precautions to properly assert the privilege, and has allowed time to pass without clarifying the basis for its assertion of privilege, waiver of the privilege may be an appropriate sanction."). Specifically, the Court concludes that, as a further sanction, WW shall be deemed to have waived any privilege claim as to the Challenged Claw-back Documents. This sanction is separate from the Court's conclusion that WW waived any claim of privilege as to the Challenged Claw-back Documents by waiting over two full years to claw the documents back as discussed *supra*, and serves as an independent ground for ordering the production of those documents.

D.    Motion to Strike

148.  Through the Motion to Strike, WW contends that portions of the Gallagher Affidavit should not be considered by the Court and/or should be stricken because the affidavit (i) contains inadmissible statements in violation of the North Carolina Rules of Evidence; (ii) contradicts Gallagher's prior deposition testimony and thus violates the "sham affidavit" rule; and (iii) discloses attorney-client privileged information.

149.  A trial court's ruling on a motion to strike an affidavit will not be disturbed absent an abuse of discretion. *Blair Concrete Servs., Inc. v. Van-Allen Steel Co.*, 152 N.C. App. 215, 219, 566 S.E.2d 766, 768 (2002).

150.  Plaintiffs submitted the Gallagher Affidavit as an exhibit to their Waiver

Motion. Gallagher was employed at WW from November 2008 until July 2011. (Gallagher Aff. ¶ 6, ECF No. 447.13.) Gallagher was hired as WW's Vice President of New Store Development, a title later changed to Vice President of Business Development. (Gallagher Aff. ¶ 8.) In both roles, Gallagher was responsible for opening new stores in new markets and identifying owners for those new stores and for failing stores in existing markets. (Gallagher Aff. ¶ 8.)

151. Of particular relevance here, the Gallagher Affidavit states as follows:

[REDACTED]

(Gallagher Aff. ¶ 19 (emphasis added).)

152. WW argues that "[i]ndependent of the veracity of the statement [in paragraph 19 of the Gallagher Affidavit], the only way that Mr. Gallagher could have personal knowledge of what Ms. Vannoy knew or did not know would be from his communications with Ms. Vannoy," and that Gallagher had no authority to disclose the contents of those privileged communications. (WW's Br. Supp. Mot. Strike 21–22, ECF No. 587.) The Court agrees with WW that "protecting the date and method of a communication . . . while divulging the substance of a communication . . . does not protect privileged communications." (WW's Br. Supp. Mot. Strike 22.) Therefore, the Court concludes, in the exercise of its discretion, that WW's Motion to Strike shall be granted to the extent it relates to paragraph 19 of the Gallagher Affidavit.

153. As to the other portions of the Gallagher Affidavit, the Court concludes that the Motion to Strike should be denied as moot because the Court does not rely on the Affidavit in deciding the Waiver Motion. *See InVue Sec. Prods., Inc. v. Stein*, 2017

NCBC LEXIS 115, at *30 (N.C. Super. Ct. Dec. 18, 2017) (denying motion to strike as moot where the evidence to which the moving party objected was "not necessary to the Court's decision" upon underlying motion); *DeCristoforo v. Givens*, 2015 NCBC LEXIS 56, at *35 (N.C. Super. Ct. May 29, 2015) (denying motion to strike affidavits as moot where court did not consider affidavits in ruling upon underlying motion).

IV.

CONCLUSION

154. **WHEREFORE**, the Court, for the reasons stated herein and in the exercise of its discretion, hereby **ORDERS** as follows:

    a. Plaintiffs' Waiver Motion is **GRANTED in part** and **DENIED in part** as follows:

        i. To the extent Plaintiffs seek an order finding that WW waived the protections of the attorney-client privilege and work-product immunity doctrine as to the Challenged Claw-back Documents, the Waiver Motion is **GRANTED**, and, commencing on September 19, 2019, the Challenged Claw-back Documents shall be available for use by any party to these actions for purposes of this litigation.[59]

        ii. To the extent Plaintiffs seek an order finding subject matter waiver

---

[59] As noted above, in its brief in opposition to the Waiver Motion, WW contends that "no documents should be released or disclosed to Plaintiffs without sufficient advance notice to WW to allow WW an opportunity to file an appeal, and the Court's decision should be stayed pending any appeal." (WW's Resp. Pls.' Waiver Mot. 13.) The Court has selected a date for compliance, mindful of the notice of appeal period under Rule 3 of the North Carolina Rules of Appellate Procedure, to provide WW an adequate opportunity to appeal and seek appropriate interim relief prior to compliance, should it choose to do so.

based on WW's voluntary production of certain documents or by operation of the crime-fraud exception, the Waiver Motion is **DENIED**.

b. Plaintiffs' Motion to Compel is **GRANTED** and the Court **ORDERS** as follows:

   i. WW shall produce all non-privileged Sample Log Documents identified in Appendix A to this Order and Opinion by no later than September 19, 2019.

   ii. Counsel for WW shall re-review all documents that WW has withheld as privileged or work product and, consistent with the standards set forth herein, produce those documents that are not privileged or protected as work product by no later than September 19, 2019.

   iii. WW shall serve revised privilege logs containing adequate and accurate document descriptions of all withheld documents by no later than September 19, 2019.

   iv. As to Plaintiffs' request for payment of its reasonable expenses, including attorneys' fees:

       1. WW shall pay Plaintiffs their reasonable expenses, including attorneys' fees, incurred in obtaining this Order. Such fees and expenses shall be limited to those incurred in (i) prosecuting the Privilege Motions; (ii) compensating the Special Master for his services; (iii) seeking and obtaining the non-privileged Review Documents, including Plaintiffs' expenses incurred in identifying

non-privileged documents, sending deficiency letters, engaging in meet and confer discussions, and complying with the BCR 10.9 process; and (iv) addressing deficiencies with WW's 2018 Logs.

2. Plaintiffs may file a petition for payment of their reasonable expenses, including attorneys' fees, with supporting affidavits and any other supporting material, by no later than September 19, 2019. WW may file a response, with supporting materials, if any, and Plaintiffs may file a reply, with supporting materials, if any, within the time periods for responses and replies set forth in BCRs 7.6 and 7.7, respectively. The Court will determine at a later date whether it will hold a hearing on any such petition.

v. Plaintiffs shall be permitted to re-depose Ms. Vannoy, Mr. Vannoy, McBride, Mathis, Blackburn, and any other person for good cause shown concerning the documents ordered to be produced hereunder, subject to the following limitations:

1. Unless extended for good cause shown, each re-deposition shall be limited to seven hours of on-the-record examination.

2. WW shall bear the costs of each re-deposition.

3. Each re-deposition shall be taken promptly after WW's production of the documents ordered to be produced hereunder.

c. WW's Motion to Strike is **GRANTED in part** and **DENIED in part** as follows:

i. As to WW's request that the Court strike and/or decline to consider paragraph 19 of the Gallagher Affidavit, the Motion to Strike is **GRANTED**.

ii. As to the remaining contested portions of the Gallagher Affidavit, the Motion to Strike is **DENIED** as moot.

**SO ORDERED**, this the 16th day of August, 2019.[60]

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[60] This Order and Opinion was originally filed under seal on August 16, 2019. This public version of the Order and Opinion is being filed on August 23, 2019. To avoid confusion in the event of an appeal, the Court has elected to state the filing date of the public version of the Order and Opinion as August 16, 2019.

| No. | Privilege | Log Description |
|---|---|---|
| **Withheld Sample Log Documents** | | |
| 2* | Properly withheld as attorney-client privileged. | The 2017 Logs adequately described SLD 2 as e-mail "correspondence between members of [WW] and Beth Vannoy, as corporate counsel, regarding information needed for FDD." The 2018 Logs, however, omit reference to an FDD, and inadequately describe the e-mail as "regarding data gathering with respect to potential compliance issues." |
| 3* | Improperly withheld. SLD 3 is an unsigned "Assignment" of certain WW intellectual property. The accompanying "parent" document, an e-mail, suggests that SLD 3 is a final version that was to be signed by Ingle "as is" and filed with the USPTO. WW has offered no evidence to suggest that revisions were subsequently made to SLD 3. | The 2017 Logs adequately described SLD 3 as a "[d]raft Assignment of marks and correlated schedule of trademarks, prepared by attorneys at MacCord Mason for review by Beth Vannoy." The 2018 Logs inadequately describe SLD 3 as a "[c]ommunication from Art MacCord and transmitted to Beth Vannoy providing legal advice." |
| 4* | Properly withheld as attorney-client privileged. | While the 2017 Logs described SLD 4 as "correspondence between Beth Vannoy and attorneys at MacCord Mason regarding registration of trademarks," the 2018 Logs describe SLD 4 inadequately as correspondence between these same persons "regarding legal advice." |
| 5 | Improperly withheld. SLD 5 is an unsigned document relating to certain WW intellectual property. The accompanying "parent" document, an e-mail from Ms. Vannoy to Ingle, suggests that SLD 5 is a final version that was to be executed "as is" and publicly filed | While the 2017 Logs adequately described SLD 5 as a "[d]raft of revised Declaration of Use prepared by MacCord Mason transmitted to Beth Vannoy for review and execution," this description was revised in the 2018 Logs to "[d]raft document prepared by outside |

---

[61] Documents marked with an asterisk are not Identified Sample Log Documents, but were addressed in WW's Exceptions.

| | | |
|---|---|---|
| | with the Canadian Intellectual Property Office, and WW offers no evidence to the contrary. | counsel for review and comment by client, Beth Vannoy." The revised description is inadequate. |
| 6* | Properly withheld as attorney-client privileged, though the Log description is inconsistent with WW's current position. | The 2017 Logs described SLD 6 as a "[s]preadsheet maintained by Beth Vannoy as corporate and in-house counsel, for tracking and renewal of franchisee licensing agreements." The 2018 Logs describe SLD 6 as a "[s]preadsheet maintained by Beth Vannoy as corporate counsel relating to provision of legal advice and communicated to internal clients at [WW]." In WW's Exceptions, however, WW contends that the spreadsheet was "created and maintained by" WW's outside counsel, not by WW's in-house counsel. The description is inaccurate and inadequate. |
| 9* | Properly withheld as attorney-client privileged and non-responsive spousal communications. | The description in the 2018 Logs ("Email communication . . . relating to legal advice, information necessary to obtain same, and unrelated communication relating to personal matters.") is inadequate as to "legal advice" but adequate as to "personal matters." |
| 11 | Properly withheld as attorney-client privileged. The contents of SLD 11, a draft document, were never revealed to third parties. (B. Vannoy Aff. ¶ 6.) | While the 2017 Logs adequately described SLD 11 as a "[d]raft Termination of Franchise Agreement," the 2018 Logs inadequately describe SLD 11 as a "[d]raft document providing legal advice." |
| 12 | Improperly withheld in part. WW concedes that SLD 12 "should have been partially redacted rather than entirely withheld." The Court agrees with WW that the overwhelming majority of SLD 12 is not privileged. WW shall produce SLD 12 with the | The 2018 Logs describe SLD 12 in full as a "[d]ocument drafted by Todd Woods at Beth Vannoy's direction." This description is directly contradicted by Ms. Vannoy's affidavit. (*See* B. Vannoy Aff. ¶ 7 ("While I did not instruct Mr. Woods to create this spreadsheet, it contains a summary of legal advice I gave Mr. |

| | | |
|---|---|---|
| | proposed redactions WW tendered to the Court on May 30, 2019.[62] | Woods.").) This description is inaccurate and inadequate. |
| 16* | Not privileged to extent published. SLD 16 is a draft FDD. WW has offered no evidence to suggest that SLD 16 was not adopted as written and published to third parties. | The 2017 Logs described SLD 16 as a "[d]raft FDD prepared by Ritchie Taylor and transmitted to Beth Vannoy for review." The 2018 Logs inadequately describe SLD 16 simply as a "[d]raft document." |
| 17* | Not privileged to extent published. SLD 16 is a draft FDD. WW has offered no evidence to suggest that SLD 17 was not adopted as written and published to third parties. | The 2017 Logs described SLD 17 as a "[d]raft FDD with changes made by Melissa Harrold at Beth Vannoy's request for review by Ritchie Taylor." The 2018 Logs inadequately describe SLD 17 as a "[d]raft document." |
| 19 | Improperly withheld in part, as WW concedes. The March 15, 2012 Notice of Electronic Filing is not privileged. Scott Walton's March, 15, 2012 e-mail is privileged and may be redacted. | The description in 2018 Logs ("Email system message containing preview of attorney-client privileged communications.") is adequate. |
| 29 | Properly withheld as attorney-client privileged. | The description in 2018 Logs ("Email . . . regarding legal advice.") is inadequate. |
| 30 | Improperly withheld in part. Deem's February 16, 2011 e-mail to Ingle and Ms. Vannoy is not privileged, as the e-mail is addressed to Ingle, conveys only business and financial information, and does not include an implied or express request for legal advice. Ms. Vannoy's March 1, 2013 e-mail to Deem is not privileged, as it is a forward without original text. Deem's March 1, 2013 e-mail to Ms. Vannoy is privileged. (*See* B. Vannoy Aff. ¶ 9.) | The description in the 2018 Logs ("Email correspondence . . . regarding legal compliance.") is inconsistent with WW's current argument as to why SLD 30 is privileged. The description is inaccurate and inadequate. |
| 31 | Improperly withheld. SLD 31 is a draft letter created by a non-lawyer for Ms. Vannoy to send to a non- | The 2017 Logs described SLD 31 as a "[d]raft letter to franchisee regarding execution of Franchise Agreement." |

---

[62] By e-mail to the parties on May 29, 2019, the Court requested that WW tender to the Court Sample Log Document No. 12 with its proposed redactions. At that time, WW had not produced to Plaintiffs a redacted version of Sample Log Document No. 12, despite its own acknowledgment on February 11, 2019 that the overwhelming majority of Sample Log Document No. 12 is not privileged.

| | | |
|---|---|---|
| | Plaintiff franchisee and does not convey legal advice. Additionally, WW offers no evidence to suggest that changes were made to the letter before it was sent. | This was revised in the 2018 Logs, which describe SLD 31 as a "[d]raft letter regarding Franchise Agreement[.]" The 2018 description does not give any indication of the nature of the letter's intended recipient and is inadequate. |
| 32 | Improperly withheld in part. As with SLD 30, Deem's February 16, 2011 e-mail to Ingle and Ms. Vannoy and Ms. Vannoy's March 1, 2013 e-mail to Deem are not privileged, but Deem's March 1, 2013 e-mail to Ms. Vannoy is privileged. Additionally, Ms. Vannoy's March 28, 2013 e-mail to Deem and Deem's March 28, 2013 e-mail to Ms. Vannoy are privileged. | The description in the 2018 Logs ("Email correspondence . . . regarding legal compliance.") is inconsistent with WW's current argument as to why the document is privileged. The description is inaccurate and inadequate. |
| 35* | Properly withheld as attorney-client privileged. | While the 2017 Logs adequately described SLD 35 as a "Trademark Research Report prepared by Ritchie Taylor," the 2018 Logs inadequately describe SLD 35 as a "[r]eport prepared by Ritchie Taylor for Beth Vannoy." |
| 36 | Improperly withheld, as SLD 36 is a spreadsheet containing only financial information that was sent from a non-lawyer at WW to an outside accountant. | The 2018 Logs described SLD 36 as "[s]preadsheet of financial information maintained at Beth Vannoy's direction and provided to Randy Blackburn at request of outside counsel with request for legal advice." As discussed in section II.C.5.c. of this Order and Opinion, the Court agrees with the Master's conclusion that this description is "particularly contrived and misleading." |
| 40 | Improperly withheld. SLD 40 is an e-mail from Mathis to Ms. Vannoy, which attaches a spreadsheet containing only financial information. WW has failed to offer evidence to support its contention that the document is privileged. | While the 2017 Logs described SLD 40 as correspondence "regarding royalties collected by [WW]," the 2018 Logs inadequately describe SLD 40 as correspondence "regarding legal advice." |

| | | |
|---|---|---|
| 42 | Improperly withheld in part. Deem's November 7, 2013 e-mail and McBride's November 7, 2013 e-mail are not privileged, as the communications are not related to legal advice. Ms. Vannoy's November 7, 2013 e-mail to Deem is privileged and may be redacted. | The description in the 2018 Logs ("Email correspondence . . . regarding legal advice.) is inadequate. |
| 43 | Improperly withheld. SLD 43 is an e-mail chain between Mathis, the WW Board, and Ms. Vannoy discussing a third party's financial information. It contains no express or implied request for or provision of legal advice. | While the 2017 Logs accurately described SLD 43 as "correspondence regarding evaluation of financial statements for franchise locations," the 2018 Logs inadequately and inaccurately describe SLD 43 as "[e]mail correspondence regarding legal advice." |
| 45 | Improperly withheld on the basis of the attorney-client privilege. SLD 45 is an e-mail from Deem to the Board, with carbon copies to Blackburn, Mathis, and Ms. Vannoy, in which Deem relayed financial information and discussed a potential settlement of a disputed claim. | The 2018 Logs describe SLD 45 as "[e]mail communication from Randy Blackburn to client as independent consultant retained by outside counsel regarding legal advice." This description is inaccurate and inadequate. |
| 53 | Not privileged to extent published. SLD 53 is a draft Management Agreement. WW has offered no evidence to suggest that SLD 53 was not adopted as written and published to third parties. | While the 2017 Logs accurately describe SLD 53 as a "[d]raft Management Agreement," the 2018 Logs describe SLD 53 as a "[d]raft legal compliance document." The 2018 description is inadequate and inaccurate. |
| 59 | Improperly withheld on the basis of the attorney-client privilege. | The 2017 Logs accurately described SLD 59 as "[e]mail correspondence regarding litigation-related expenses incurred by [WW] on behalf of franchisee." The 2018 Logs describe SLD 59 as "[e]mail correspondence regarding legal issue in unrelated litigation." Although with less detail, the 2018 description is adequate. |
| 60 | Properly withheld. (*See* B. Vannoy Aff. ¶ 15; Taylor Aff. ¶ 3.) | The 2017 Logs described SLD 60 as a "[d]raft document prepared by Beth Vannoy in conjunction with negotiations." The 2018 Logs |

| | | |
|---|---|---|
| | | describe SLD 60 as a "[d]raft document prepared by Beth Vannoy in conjunction with providing legal advice." Both descriptions, however, conflict with statements made in Ms. Vannoy's affidavit. (*See* B. Vannoy Aff. ¶ 15.) The description is inaccurate and inadequate. |
| 61 | Improperly withheld in part. Ms. Vannoy's e-mail to Taylor, Whitworth, Deem, and Mathis is a transmittal email without original text and is thus not privileged. The subject line and attachment name, however, may properly be considered privileged. | The 2017 Logs describe SLD 61 as an "[e]mail transmitting draft document prepared by Beth Vannoy in conjunction with negotiations." The 2018 Logs describe SLD 61 as an "[e]mail transmitting draft document prepared by Beth Vannoy related to legal advice." Ms. Vannoy's affidavit states that she did not personally prepare the transmitted document. (*See* B. Vannoy Aff. ¶ 15.) The description in the 2018 Logs is inaccurate and inadequate. |
| 62 | Improperly withheld on the basis of the attorney-client privilege. | The 2017 Logs accurately described SLD 62 as "[e]mail correspondence regarding invoice for fees incurred by [WW] in providing legal defense for franchisee." The 2018 Logs describe SLD 62 as "[e]mail correspondence regarding legal dispute in unrelated litigation." Although with less detail, the 2018 description is adequate. |
| 63 | Improperly withheld on the basis of the attorney-client privilege. SLD 63 contains (i) an automated e-mail from WW's Kyocera scanner to Mathis, (ii) an e-mail from Mathis forwarding the Kyocera e-mail to Ms. Vannoy, and (iii) an e-mail from Ms. Vannoy forwarding Mathis's e-mail to Taylor. The only original text in all three e-mails appears in the subject line and is not privileged. | The 2017 Logs describe SLD 63 as e-mail correspondence "regarding invoicing for legal fees incurred in litigation." The 2018 Logs describe SLD 63 as e-mail correspondence "requesting legal advice regarding unrelated litigation." Although with less detail, the 2018 description is adequate. |
| 65 | Improperly withheld, as WW concedes. | The description in the 2018 Logs ("Draft Franchise Agreement with |

| | | Exhibits, prepared by Beth Vannoy") is adequate and accurate. |
|---|---|---|
| | **Redacted Sample Log Documents** | |
| 69 | Improperly redacted in part. SLD 69 is an e-mail from Gallagher to Tammy Whitworth, Ingle, and Deem. The only privileged portions are (i) the sentence beginning with "Any" and ending with "date," and (ii) from the sentence beginning with "These can be" through the end of the paragraph. The remaining portions simply convey factual information and are not privileged. | The 2018 Logs inadequately describe the redacted portion of SLD 69 as "[e]mail content relating to privileged communications relating to compliance and legal strategy between Beth Vannoy and Sean Gallagher." |
| 72 | Improperly redacted. The redacted portion of SLD 72 is an e-mail from Ingle to Deem, copying Ms. Vannoy, discussing a potential settlement of a disputed claim. It does not contain an implied or express request for legal advice. | While the 2017 Logs accurately described the redacted e-mail as "related to Dana Deem correspondence with non-Plaintiff franchisee," the 2018 Logs inadequately describe it as correspondence "relating to legal advice." |
| 80 | Improperly redacted. In SLD 80, Taylor forwarded a non-privileged third-party communication to Ms. Vannoy, adding only "FYI." Taylor's e-mail is not privileged. WW shall produce SLD 80 without redactions. | The description in the 2018 Logs ("Email correspondence . . . relating to legal compliance.") is inadequate and inaccurate. |
| 83 | Improperly redacted in part. Tammy Whitworth's e-mail to the Board, Deem, and Ms. Vannoy is not privileged. Mr. Vannoy's e-mail to Ms. Vannoy at 11:59 AM is also not privileged. Mr. Vannoy's e-mail at 1:42 PM, however, is privileged and may properly be redacted. | While the 2017 Logs accurately described SLD 83 as e-mail correspondence "related to Blair Ingle and [WW]," this description was changed in the 2018 Logs to e-mail correspondence "relating to legal advice." The 2018 description is inadequate. |
| 84 | Improperly redacted. SLD 84 is an e-mail chain originating with a non-privileged third party communication to Deem. WW redacted (i) Deem's forwarding e-mail to Ms. Vannoy, which adds only "FYI" and (ii) Ms. Vannoy's forwarding e-mail to Mr. Vannoy, | While the 2017 Logs accurately described SLD 84 as e-mail correspondence "related to Jim and Toni Ballard rescinding their membership with the 189 DA," this description was changed in the 2018 Logs to e-mail correspondence |

| | | |
|---|---|---|
| | which does not add any original text. These are not protected by the attorney-client privilege. | "relating to legal advice." The 2018 description is inadequate. |
| 87 | Improperly redacted. The redacted portion of SLD 87 is a forwarding e-mail from Deem to Ms. Vannoy that does not include any original text and is not privileged. | The description in the 2018 Logs ("Email correspondence . . . regarding legal advice.") is inadequate. |
| 88* | Properly redacted. | The description in the 2018 Logs ("Email . . . regarding request for legal advice.") is inadequate. |
| 91* | Improperly redacted in part. Deem's e-mail to Ms. Vannoy is not privileged, as it merely transmits a third-party communication, adding only "FYI." Ms. Vannoy's March 20, 2012 e-mail to Taylor is privileged and was properly redacted. WW shall produce SLD 91 with redactions only as to Ms. Vannoy's e-mail. | While the 2017 Logs accurately described SLD 91 as e-mail correspondence "related to Colin Justus email to Bill Curran," this description was revised in the 2018 Logs to e-mail correspondence "relating to legal advice." The 2018 description is inadequate. |
| 93* | Properly redacted. | The description in the 2018 Logs ("Email . . . related to legal advice.") is inadequate. |
| 104* | Improperly redacted. Deem's February 17, 2013 e-mail to Ms. Vannoy is not privileged, as it only transmits a non-privileged third-party communication and does not include an express or implied request for legal advice. | While the 2017 Logs accurately described SLD 104 as e-mail correspondence "related to non-plaintiff franchise location," this description was revised in the 2018 Logs to e-mail correspondence "relating to legal advice." The 2018 description is inadequate. |
| 109 | Improperly redacted. Ms. Vannoy's March 25, 2013 e-mail to Taylor and Mathis's e-mail to Ms. Vannoy are not privileged, as both e-mails only transmit a non-privileged third-party communication without adding original substance. | The description in the 2018 Logs ("Email correspondence . . . relating to legal advice.") is inadequate. |
| 110 | Improperly redacted in part. Deem's March 16, 2013 e-mail to Ms. Vannoy is a non-privileged transmittal e-mail. The remaining redacted portions of SLD 110 are privileged. | The description in the 2018 Logs ("Email correspondence . . . relating to legal advice.") is inadequate. |

| | | |
|---|---|---|
| 111 | Improperly redacted in part. Deem's April 17, 2013 e-mail to Ms. Vannoy is not privileged, as it merely forwards a non-privileged third-party communication without adding original text. Ms. Vannoy's subsequent e-mail may properly be considered privileged. | The description in the 2018 Logs ("Email correspondence relating to legal advice and strategy.") is inadequate. |
| 113 | Improperly redacted in part. Ms. Vannoy's May 15, 2013 e-mail to Deem at 3:13 PM is not privileged, as it merely forwards a non-privileged third-party communication without adding original text. Ms. Vannoy's May 15, 2013 e-mail to Deem at 3:16 PM is protected by the attorney-client privilege. | While the 2017 Logs accurately described SLD 113 as e-mail correspondence "related to vendor license agreement," the 2018 Logs inadequately describe SLD 113 as e-mail correspondence "relating to legal advice." The 2018 description is inadequate. |
| 117* | Properly redacted. | The description in the 2018 Logs ("Email . . . related to legal advice.") is inadequate. |
| 119* | Properly redacted. | The description in the 2018 Logs ("Email . . . relating to legal advice.") is inadequate. |
| 121* | Properly redacted as attorney-client privileged. | The description in the 2018 Logs ("Email . . . related to legal advice.") is inadequate. |
| 122 | Improperly redacted. Ms. Vannoy's August 12, 2013 e-mail to Taylor is not privileged, as it merely forwards a non-privileged communication without adding original text. Deem's August 12, 2013 e-mail to the Board, Ms. Vannoy, and Mathis is not privileged, as it does not seek legal advice and because WW produced the same e-mail separately without asserting a claim of privilege. | The description in the 2018 Logs ("Email correspondence . . . related to legal advice.") is inadequate and inaccurate. |
| 126 | Improperly redacted. The redacted portion of SLD 126, Mr. Vannoy's January 1, 2014 e-mail to the Board, Mathis, Ms. Vannoy, and Deem, does not convey legal advice. Fairly read, Mr. Vannoy's e-mail indicated that he was acting in his capacity as a | While the 2017 Logs accurately described SLD 126 as e-mail correspondence "related to Jim Roland email to Dana Deem," the 2018 Logs inadequately describe SLD 126 as e-mail correspondence |

| | | |
|---|---|---|
| | board member, not WW's outside counsel. | "relating to legal advice regarding negotiations." |
| 127 | Improperly redacted. Ms. Vannoy's January 6, 2014 e-mail to Taylor and Deem's January 6, 2014 e-mail to Ms. Vannoy are not privileged, as both e-mails only transmit a non-privileged third-party communication without adding original substance. | The description in the 2018 Logs ("Email . . . related to legal advice regarding negotiations with Plaintiffs.") is adequate. |
| 128 | Properly redacted. | The description in the 2018 Logs ("Email . . . relating to legal negotiations.") is inadequate. |
| 130 | Improperly redacted. Ms. Vannoy's April 2, 2014 e-mail to Mr. Vannoy is not privileged, as it is a non-substantive transmittal e-mail that does not seek or provide legal advice. Mr. Vannoy's April 2, 2014 e-mail to Ms. Vannoy is not privileged, as it concerns a business matter, not a legal matter. | Because the redacted portion of SLD 130 addresses solely business matters, the description in the 2018 Logs ("Email correspondence . . . related to legal advice.") is inaccurate. It is also inadequate. |
| 133 | Improperly redacted. Ms. Vannoy's April 24, 2014 e-mail to Mathis and Taylor's April 24, 2014 e-mail to Ms. Vannoy are not privileged, as both e-mails only transmit a non-privileged communication without adding original text, other than "FYI." | While the 2017 Logs accurately described SLD 133 as e-mail correspondence "related to Ritchie Taylor email to Jeff Oleynik and Charles Coble," the 2018 Logs inadequately describe it as e-mail correspondence "relating to legal advice." |
| 135 | Improperly redacted. Deem's June 2, 2014 e-mail to Ms. Vannoy is not privileged, as it only forwards a non-privileged third-party communication, adding only "FYI." | The description in the 2018 Logs ("Email . . . related to legal advice.") is inadequate and inaccurate. |
| 136 | Improperly redacted in part. Ms. Vannoy's July 23, 2014 e-mail to the Board, Deem, and Mathis is a non-privileged transmittal e-mail without original text. Taylor's July 23, 2014 e-mail to Ms. Vannoy may properly be considered privileged. | While the 2017 Logs accurately described SLD 136 as e-mail correspondence "regarding letter received from Charles Coble," this was changed in the 2018 Logs to state e-mail correspondence "regarding legal advice and strategy." The 2018 description is inadequate. |

| | | |
|---|---|---|
| 137 | Improperly redacted in part. Tammy Whitworth's August 5, 2014 e-mail to the Board, Deem, and Mark Bumgarner (with copy to Ms. Vannoy) is not privileged, as it is a business communication that does not seek legal advice. Ms. Vannoy's subsequent e-mail may properly be considered privileged. | The 2017 Logs accurately described SLD 137 as e-mail "correspondence regarding Notice of Window World Chapter formation." The 2018 Logs, however, describe SLD 137 as "correspondence regarding legal advice." The 2018 description is inadequate. |
| 142 | Improperly redacted. Taylor's November 6, 2014 e-mail to Ms. Vannoy is not privileged, as it merely forwards a non-privileged communication without substantive comment. | The description in the 2018 Logs ("Email correspondence relating to legal advice.") is inadequate and inaccurate. |
| 143 | Properly redacted on the basis of the attorney client privilege. | The description in the 2018 Logs ("Email . . . relating to legal advice.") is inadequate. |
| 146 | Improperly redacted. The redacted portions of McBride's February 18, 2015 e-mail, Whitworth's February 18, 2015 e-mail, and Steve Kamody's February 18, 2015 e-mail are not privileged, as the e-mails relate to business matters and do not seek legal advice. Mark Bumgarner is not an attorney. | While the 2017 Logs accurately described SLD 146 as e-mail correspondence "related to 2015 regionals," this description was revised in the 2018 Logs to e-mail correspondence "relating to legal advice." The 2018 description is inadequate. |
| 147* | Properly redacted. | While the 2017 Logs adequately described SLD 147 as e-mail correspondence "related to vendor agreement," this description was changed in the 2018 Logs to correspondence "relating to legal advice." The 2018 description is inadequate. |

| No. | Master's Report (& Excepting Party) | Court's Findings and Conclusions |
| --- | --- | --- |
| 1 | Not privileged. | Not privileged; relinquished via JFB Ex. 3. |
| 2 | Not privileged in part. | Properly redacted. |
| 3 | Not privileged in part. | Properly redacted. |
| 4 | Not privileged. (WW) | Not privileged. WW has offered no evidence to suggest that CCD No. 4—a draft Termination Agreement between WW and a non-Plaintiff dealer—was not adopted as written. Indeed, Ms. Vannoy's e-mail transmitting CCD 4 to Ingle describes it as "finalized." (*See* Goode Aff. Ex. A, ECF No. 498.1.) |
| 5 | Not privileged. (WW) | Not privileged. CCD 5 is a draft agreement between WW and a non-Plaintiff dealer. The extent to which CCD 5 was adopted as written and published to third parties is unclear; thus WW has not met its burden. (*See* Goode Aff. Ex. B, ECF No. 498.2.) |
| 6 | Not privileged. (WW) | Not privileged. WW has offered no evidence to suggest that CCD 6—a draft Termination Agreement between WW and a non-Plaintiff dealer—was not adopted as written. Indeed, Ms. Vannoy's e-mail transmitting CCD 6 to Ingle describes it as "finalized." (*See* Goode Aff. Ex. A.) |
| 7 | Not privileged in part. | Properly redacted. |
| 8 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 9 | Privileged. (Pls.) | Privileged. |
| 10 | Not privileged in part. (WW) | Not privileged in part; relinquished via WW's Exceptions. WW rightly concedes that it "over-redacted portions of" CCD 10, including non-privileged third-party communications. Ms. Vannoy's November 20, 2012 e-mail to Deem is the only privileged communication. |
| 11 | Privileged. (Pls.) | Privileged. |
| 12 | Privileged. (Pls.) | Privileged. |
| 13 | Privileged. (Pls.) | Privileged. |
| 14 | Privileged. (Pls.) | Privileged. |
| 15 | Privileged. (Pls.) | Privileged. |
| 17 | Not privileged in part. | Properly redacted. |

[63] Appendix B includes (i) all Challenged Claw-back Documents that the Master concluded were either non-privileged or partially non-privileged, (ii) all relinquished Challenged Claw-back Documents, and (iii) all Challenged Claw-back Documents at issue in the parties' Exceptions.

| 19 | Not privileged. | Not privileged; relinquished on 6/27/18. |
|----|-----------------|-------------------------------------------|
| 20 | Not work product. (WW) | Work product. The e-mails that WW redacted appear to have been prepared and sent in anticipation of litigation with Plaintiffs. |
| 21 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 22 | Not privileged. (WW) | Not privileged. Deem's January 6, 2014 e-mail to Ms. Vannoy is not privileged, as it only forwards a non-privileged third-party communication without adding any original text. |
| 23 | Not privileged in part. (Pls.) | Properly redacted. |
| 28 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 30 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 32 | Not privileged. (WW) | Not privileged. CCD 32 is a November 30, 2007 letter from a third-party, AMI, to WW's Todd Whitworth with the subject line "Sole Source Partnership Program." The parent document suggests that Deem forwarded CCD 32 to Ms. Vannoy in 2012. While WW contends that CCD 32 contains Deem's highlighting, WW offers no evidence to suggest that Deem highlighted the document in connection with seeking legal advice. Even if WW had made such a showing, the limited highlighting would not render the entire document privileged. *See Morris*, 2011 NCBC LEXIS 34, at *15 ("A communication will not be deemed privileged merely because an in-house attorney was . . . forwarded a copy of a document."). |
| 33 | Not privileged. (WW) | Not privileged. CCD 33 is a January 2009 letter from a third-party, AMI, to WW's Todd Whitworth with the subject line "Sole Source Partnership Program." That CCD 33 was sent to Ms. Vannoy nearly four years later does not make it privileged. |
| 35 | Not privileged. (WW) | Not privileged in part. Deem's e-mail to several WW employees, including Ms. Vannoy, merely forwards a price list that Deem received from AMI. The last sentence of Deem's e-mail is privileged. |
| 36 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 37 | Not privileged. | Not privileged; relinquished on 5/18/18. |
| 39 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 40 | Not privileged in part. | Properly redacted. |
| 42 | Privileged. (Pls.) | Not privileged; relinquished on 6/27/18. |
| 43 | Privileged. (Pls.) | Properly redacted. |
| 46 | Privileged. (Pls.) | Privileged. |
| 47 | Privileged. (Pls.) | Privileged. |

| | | |
|---|---|---|
| 48 | Privileged. (Pls.) | Not privileged. WW has failed to show that the material it seeks to redact—an e-mail subject line—is privileged. |
| 49 | Not privileged. (WW) | Not privileged. CCD 49 is a script prepared in anticipation of a conference call between members of WW corporate and store owners relating to WW's announcement that it was "converting" to a franchise system. While the script appears to have been written by Mr. Vannoy or Ms. Vannoy for Whitworth, WW offers no evidence to suggest that the script was not adopted as written and read to store owners. Further, WW has failed to show that the script was prepared in the course of providing legal advice. |
| 50 | Privileged. (Pls.) | Not privileged. WW has failed to show that the material it seeks to redact—an e-mail subject line—is privileged. |
| 51 | Not privileged. (WW) | Not privileged. As with CCD 49, CCD 51 is a script. WW has similarly failed to show that the script (i) was not adopted as written and read to store owners and/or (ii) was prepared in the course of providing legal advice. |
| 52 | Privileged. (Pls.) | Not privileged. WW offers no evidence to suggest that the e-mails at CCD 52 are related to legal advice. |
| 54 | Privileged. (Pls.) | Privileged. |
| 58 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 59 | Not privileged in part. | Not privileged in part; relinquished via JFB Ex. 3. |
| 61 | Privileged. (Pls.) | Privileged. |
| 62 | Privileged. (Pls.) | Privileged. |
| 65 | Privileged. (Pls.) | Privileged. |
| 66 | Not privileged in part. | Not privileged in part; relinquished via WW's Exceptions. In its Exceptions, WW concedes that it "mistakenly over-redacted" CCD 66. Indeed, of the seven e-mails that WW redacted, five are non-privileged third-party communications and one is a non-privileged forwarding e-mail from Ms. Vannoy to Deem without original text. The only privileged communication is Deem's March 17, 2013 e-mail to Ms. Vannoy. |
| 68 | Not privileged in part. | Properly redacted. |
| 70 | Not privileged. | Not privileged; relinquished on 4/17/18 and 5/18/18. |
| 71 | Not privileged. | Not privileged; relinquished on 4/17/18. |
| 72 | Not privileged. | Not privileged; relinquished on 5/18/18. |
| 73 | Not privileged. | Not privileged; relinquished via WW's Exceptions. |
| 74 | Not privileged. | Not privileged; relinquished on 5/18/18. |

| 75 | Not privileged. | Not privileged; relinquished on 5/18/18. |
|---|---|---|
| 76 | Not privileged. | Not privileged; relinquished on 5/18/18. |
| 77 | Not privileged. | Not privileged; relinquished via WW's Exceptions. |
| 79 | Privileged. (Pls.) | Privileged. |
| 80 | Privileged. (Pls.) | Not privileged. CCD 80 is a draft Franchise Agreement between WW and a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 80 was not adopted as written and published to third parties. |
| 81 | Privileged. (Pls.) | Not privileged. CCD 81 is a draft Confidentiality Agreement between WW and a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 81 was not adopted as written and published to third parties. |
| 85 | Not privileged. | Not privileged; relinquished on 5/18/18. |
| 87 | Privileged. (Pls.) | Privileged. |
| 88 | Not privileged. | Not privileged; relinquished on 5/18/18. |
| 89 | Privileged. | Relinquished on 5/18/18. |
| 90 | Privileged. (Pls.) | Not privileged. As with CCD 49 and CCD 51, CCD 90 is a script. WW has similarly failed to show that the script (i) was not adopted as written and read to store owners and/or (ii) was prepared in the course of providing legal advice. |
| 91 | Privileged. | Relinquished on 5/18/18. |
| 92 | Privileged. | Relinquished on 5/18/18. |
| 93 | Privileged. | Relinquished on 4/17/18. |
| 95 | Privileged. (Pls.) | Not privileged. WW offers no evidence to suggest that the e-mail at CCD 95 is related to legal advice. |
| 97 | Not privileged. | Not privileged; relinquished on 6/28/18. |
| 101 | Privileged. (Pls.) | Privileged. |
| 102 | Privileged. (Pls.) | Not privileged. CCD 102 is a draft Termination Notice relating to a Sole Source Agreement between WW and AMI. WW has offered no evidence to suggest that CCD 102 was not adopted as written and published to third parties. |
| 106 | Privileged. (Pls.) | Not privileged in part. The second e-mail in time—from Ms. Vannoy to Gregory—is a forward without original text and is not privileged. The remainder of CCD 106 is privileged. |
| 107 | Privileged. (Pls.) | Not privileged. CCD 107 is a draft Confidentiality Agreement. Accompanying documents show that CCD 107 was prepared for a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 107 |

| | | |
|---|---|---|
| | | was not adopted as written and published to third parties. |
| 108 | Privileged. (Pls.) | Not privileged. CCD 108 is a draft Franchise Agreement between WW and a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 108 was not adopted as written and published to third parties. |
| 109 | Not privileged. (WW) | Not privileged. CCD 109 is a draft letter created by a non-lawyer for Ms. Vannoy to send to a non-Plaintiff franchisee and does not convey legal advice. Additionally, WW offers no evidence to suggest that changes were made to the letter before it was sent. |
| 111 | Privileged. (Pls.) | Properly redacted. |
| 112 | Privileged. (Pls.) | Not privileged. Ms. Vannoy's February 21, 2013 e-mail to herself at 4:53 PM is not privileged, as it merely transmits a non-privileged communication without adding original text. |
| 116 | Privileged. (Pls.) | Privileged. |
| 118 | Not privileged in part. (Pls.) | Not privileged in part. Ms. Vannoy's May 15, 2013 e-mail to Deem at 3:13 PM is not privileged, as it merely forwards a non-privileged third-party communication without adding original text. Ms. Vannoy's May 15, 2013 e-mail to Deem at 3:16 PM is privileged. |
| 119 | Not privileged in part. (Pls.) | Not privileged in part. As with CCD 118, Ms. Vannoy's May 15, 2013 e-mail to Deem at 3:13 PM is not privileged. The remaining redacted e-mails in CCD 119 are privileged. |
| 121 | Not privileged in part. | Properly redacted. |
| 122 | Not privileged. | Not privileged; relinquished via WW's Exceptions. |
| 123 | Not privileged. | Not privileged; relinquished via WW's Exceptions. |
| 126 | Not privileged in part. | Properly redacted. |
| 127 | Not privileged. | Not privileged; relinquished via WW's Exceptions. |
| 131 | Privileged. (Pls.) | Not privileged. CCD 131 appears to be a draft communication from WW corporate to WW dealers. The accompanying parent e-mail shows that CCD 131 was sent from Deem to Ms. Vannoy. WW offers no evidence to suggest that it was sent in the course of seeking legal advice or that changes were made to the communication before it was sent to WW dealers. |
| 133 | Not privileged. (WW) | Not privileged. CCD 133 is a draft FDD. WW has offered no evidence to suggest that CCD 133 was not adopted as written and published to third parties. |
| 134 | Not privileged. | Not privileged; relinquished on 6/28/18. |

| | | |
|---|---|---|
| 142 | Not privileged. (WW) | Not privileged. In CCD 142, Deem forwards to Ms. Vannoy a non-privileged third party communication and requests a meeting to discuss. |
| 144 | Not privileged. (WW) | Not privileged. CCD 144 is a draft Confidential License Agreement between WW and AMI. WW has offered no evidence to suggest that CCD 144 was not adopted as written and published to third parties. |
| 146 | Privileged. (Pls.) | Not privileged. CCD 146 is a draft Confidential License Agreement between WW and AMI. WW has offered no evidence to suggest that CCD 146 was not adopted as written and published to third parties. |
| 147 | Not privileged. (WW) | Not privileged. Deem's May 22, 2013 e-mail to Ms. Vannoy is not privileged, as it only forwards a non-privileged third-party communication without adding any original text. |
| 148 | Privileged. (Pls.) | Privileged. |
| 149 | Not privileged. (WW) | Not privileged. CCD 149 is a draft Confidential Supply and License Agreement between WW and AMI. WW has offered no evidence to suggest that CCD 149 was not adopted as written and published to third parties. |
| 150 | Not privileged. (WW) | Not privileged. CCD 150 is a draft Confidential Supply and License Agreement between WW and AMI. WW has offered no evidence to suggest that CCD 150 was not adopted as written and published to third parties. |
| 151 | Not privileged in part. | Properly redacted. |
| 155 | Not privileged. (WW) | Not privileged. Mr. Vannoy's November 20, 2013 e-mail to Ms. Vannoy is not privileged, as it only forwards a non-privileged third-party communication without adding any original text. |
| 156 | Privileged. (Pls.) | Properly redacted. |
| 157 | Privileged. (Pls.) | Privileged. |
| 158 | Not privileged. (WW) | Properly redacted. |
| 160 | Privileged. (Pls.) | Privileged. |
| 161 | Not privileged. (WW) | Not privileged. CCD 161 is a draft Franchise Agreement. WW has offered no evidence to suggest that CCD 161 was not adopted as written and published to third parties. |
| 162 | Privileged. (Pls.) | Privileged. |
| 163 | Privileged. (Pls.) | Privileged. |
| 164 | Privileged. (Pls.) | Privileged. |
| 165 | Not privileged. (WW) | Not privileged. CCD 165 is a draft Franchise Agreement. WW has offered no evidence to suggest |

| | | that CCD 165 was not adopted as written and published to third parties. |
|---|---|---|
| 167 | Not privileged. (WW) | Privileged. |
| 168 | Not privileged. (WW) | Not privileged. CCD 168 is a draft Franchise Agreement. WW has offered no evidence to suggest that CCD 168 was not adopted as written and published to third parties. |
| 169 | Not privileged. (WW) | Not privileged. CCD 169 is a draft attachment to a Franchise Agreement. WW has offered no evidence to suggest that CCD 169 was not adopted as written and published to third parties. |
| 175 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 176 | Privileged. (Pls.) | Privileged |
| 177 | Privileged. (Pls.) | Not privileged. CCD 177 is a draft Franchise Agreement. WW has offered no evidence to suggest that CCD 177 was not adopted as written and published to third parties. |
| 186 | Not privileged. (WW) | Privileged based WW's representation that the draft e-mail was not sent. |
| 187 | Not privileged. (WW) | Not privileged. WW has offered no evidence to suggest that CCD 187 was not adopted as written and published to third parties. |
| 189 | Not privileged in part. (Pls.) | Properly redacted. |
| 191 | Privileged. (Pls.) | Not privileged. WW has failed to show that the material it seeks to redact—an e-mail subject line—is privileged. |
| 195 | Privileged. (Pls.) | Privileged. |
| 197 | Privileged. (Pls.) | Privileged. |
| 198 | Privileged. (Pls.) | Not privileged. CCD 198 is a draft Franchise Rescission Offer. WW has offered no evidence to suggest that CCD 198 was not adopted as written and published to third parties. |
| 200 | Not privileged in part. (Pls.) | Not privileged. Ms. Vannoy's April 22, 2013 e-mail to Deem merely forwards a non-privileged third-party communication without adding original text. |
| 201 | Not privileged. (WW) | Not privileged. Ms. Vannoy's May 15, 2013 e-mail to Deem merely forwards a non-privileged third-party communication without adding original text. |
| 204 | Not privileged. (WW) | Not privileged. Ms. Vannoy's June 13, 2013 e-mail to Deem merely forwards a non-privileged third-party communication without adding original text. |

| 205 | Not privileged. (WW) | Not privileged. Ms. Vannoy's June 13, 2013 e-mail to Deem merely forwards a non-privileged third-party communication, adding only "FYI." |
|------|----------------------|----------------------------------------------------------------------------------------------------------------------------------------------------|
| 206 | Privileged. (Pls.) | Privileged. |
| 207 | Privileged. (Pls.) | Not privileged. Ms. Vannoy's June 14, 2013 e-mail to Barlow merely transmits a document without adding original text. |
| 208 | Privileged. (Pls.) | Not privileged. CCD 208 is a draft Confidential Supply and License Agreement between WW and AMI. WW has offered no evidence to suggest that CCD 208 was not adopted as written and published to third parties. |
| 209 | Privileged. (Pls.) | Privileged. |
| 210 | Privileged. (Pls.) | Privileged. |
| 211 | Privileged. (Pls.) | Not privileged. Ms. Vannoy's June 14, 2013 e-mail to Barlow merely transmits a document without adding original text. |
| 214 | Not privileged. (WW) | Not privileged. Ms. Vannoy's June 17, 2013 e-mail to Deem merely forwards a non-privileged third-party e-mail, adding only "FYI." Barlow's June 14, 2013 e-mail is not privileged because it was forwarded to an AMI representative, among other reasons. |
| 215 | Not privileged in part. | Properly redacted. |
| 216 | Not privileged. (WW) | Not privileged. Ms. Vannoy's June 24, 2013 e-mail to Deem merely forwards a non-privileged third-party communication without adding original text. |
| 218 | Not privileged in part. (Pls.) | Not privileged. Ms. Vannoy's June 26, 2013 e-mail to Deem merely forwards a non-privileged third-party communication without adding original text. |
| 219 | Not privileged. (WW) | Not privileged. Ms. Vannoy's June 27, 2013 e-mail to Deem merely forwards a non-privileged third-party communication without adding original text. |
| 220 | Not privileged. (WW) | Not privileged. Ms. Vannoy's July 26, 2013 e-mail to Deem merely forwards a non-privileged third-party communication, adding only "FYI." |
| 221 | Not privileged. (WW) | Properly redacted. |
| 222 | Privileged. (Pls.) | Not privileged. Ms. Vannoy's July 26, 2013 e-mail to Megan Harabid merely transmits a document. |
| 223 | Privileged and work product. (Pls.) | Not privileged or work product to extent published. *Cf. State v. Holston*, 134 N.C. App. 599, 606, 518 S.E.2d 216, 221 (1999) (concluding work-product protection was waived where document was disclosed to a third party). CCD No. 223 is a draft Confidential Settlement and Release Agreement |

| | | between WW, a non-Plaintiff franchisee, and a third party. WW has offered no evidence to suggest that CCD 223 was not adopted as written and published to third parties. |
|---|---|---|
| 226 | Not privileged in part. (Pls.) | Properly redacted. |
| 227 | Not privileged. (WW) | Not privileged in part. Deem's November 5, 2013 e-mail to Ms. Vannoy is privileged. Ms. Vannoy's November 5, 2013 e-mail to Gregory is a non-privileged forwarding e-mail without original text. |
| 229 | Not privileged. (WW) | Properly redacted. |
| 230 | Privileged. (Pls.) | Not privileged in part. Ms. Vannoy's March 24, 2014 e-mail to Deem at 3:00 PM and Ms. Vannoy's March 24, 2014 e-mail to Woods at 3:01 PM are privileged. The first two e-mails in time are not privileged. |
| 231 | Not privileged. (WW) | Not privileged. CCD 231 is a spreadsheet prepared by Mathis containing only financial information. |
| 232 | Privileged. (Pls.) | Privileged. |
| 233 | Privileged. (Pls.) | Privileged. |
| 238 | Privileged. (Pls.) | Privileged. |
| 239 | Not privileged and not work product. (WW) | Not privileged in part. Gregory's April 23, 2015 e-mail to Ms. Vannoy at 12:26 PM is privileged. The remaining e-mails are not privileged. The work-product doctrine does not apply. |
| 240 | Privileged. (Pls.) | Privileged. |
| 241 | Privileged. (Pls.) | Not privileged. CCD 241 is a draft Notice of Termination relating to a "Licensing Agreement" between WW and a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 241 was not adopted as written and published to third parties. |
| 242 | Privileged. (Pls.) | Not privileged. CCD 242 is a draft Notice of Termination relating to a "Licensing Agreement" between WW and a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 242 was not adopted as written and published to third parties. |
| 243 | Privileged. (Pls.) | Not privileged. CCD 243 is a draft Notice of Termination relating to a "Licensing Agreement" between WW and a non-Plaintiff franchisee. WW has offered no evidence to suggest that CCD 243 was not adopted as written and published to third parties. |
| 244 | Privileged. (Pls.) | Not privileged. CCD 244 is a draft Notice of Termination relating to a "Licensing Agreement" between WW and a non-Plaintiff franchisee. WW has |

| | | | offered no evidence to suggest that CCD 244 was not adopted as written and published to third parties. |
|---|---|---|---|
| 245 | Not privileged. | | Not privileged; relinquished on 4/17/18. |
| 246 | Not privileged in part. (WW) | | Not privileged in part. CCD 246 consists of eight e-mails. The only privileged e-mails are (i) Taylor's September 16, 2014 e-mail to Ms. Vannoy at 7:54 AM and (ii) Ms. Vannoy's September 16, 2014 e-mail at 4:08 PM. Additionally, the last line of Whitworth's September 17, 2014 e-mail may properly be considered privileged. The remaining e-mails are not privileged. |
| 247 | Not privileged. (WW) | | Not privileged. CCD 247 is a spreadsheet of financial information sent from Gregory to Mathis. |
| 248 | Not privileged. (WW) | | Not privileged. CCD 248 is a spreadsheet of financial information sent from Gregory to Mathis. |
| 249 | Not privileged. (WW) | | Not privileged. CCD 249 is an e-mail from Mathis to the Board and Ms. Vannoy. Contrary to WW's suggestion, CCD 249 includes no "discussion regarding a potential settlement of claims threatened by some Plaintiffs here." |
| 250 | Not privileged. (WW) | | Not privileged in part. CCD 250, an e-mail from Mathis to Ms. Vannoy with a carbon copy to Deem, transmits a spreadsheet of financial information. The only privileged portion of CCD 250 is the sentence beginning with "Beth" and ending with "further." |
| 252 | Not privileged. (WW) | | Not privileged. That CCD 252—a spreadsheet of financial information apparently prepared by Mathis—was sent to Ms. Vannoy does not make it privileged. WW offers no evidence to support its contention that CCD 252 was maintained "at the request of" Ms. Vannoy. |
| 254 | Not privileged. (WW) | | Not privileged. CCD 254 is a spreadsheet listing the revenue for each WW store. The accompanying parent document shows that Mathis sent CCD 254 to the Board and Ms. Vannoy to assist them with "decision making." WW offers no evidence to suggest—nor does it even argue—that the "decision making" concerned legal matters. |
| 255 | Not privileged. (WW) | | Not privileged. CCD 255 is WW's 2015 budget and was attached to the same parent e-mail as CCD 254. |
| 256 | Not privileged. | | Not privileged; relinquished on 6/27/18. |
| 257 | Not privileged. (WW) | | Not privileged. CCD 257 is a spreadsheet of financial information sent from Gregory to Mathis. |

| | | |
|---|---|---|
| 258 | Not privileged in part. (Pls.) | Not privileged in part. Ingle's January 10, 2011 e-mail to Ms. Vannoy merely forwards a non-privileged third-party communication without adding original text. The last two e-mails in time are privileged. |
| 259 | Not privileged. (WW) | Not privileged in part. As with SLD 69, WW improperly redacted part of Gallagher's e-mail to Whitworth, Ingle, and Deem. The only privileged portions are (i) the sentence beginning with "Any" and ending with "date," and (ii) from the sentence beginning with "These can be" through the end of the paragraph. The remaining portions simply convey factual information and are not privileged. |
| 260 | Not privileged in part. (Pls.) | Not privileged in part. WW improperly redacted Deem's non-privileged March 1, 2012 e-mail to Ms. Vannoy. Ms. Vannoy's March 1, 2012 e-mail to Deem and Woods is privileged. |
| 261 | Not privileged in part. (WW) | Not privileged in part. As with CCD 260, WW improperly redacted Deem's March 1, 2012 e-mail to Ms. Vannoy. However, Ms. Vannoy's March 1, 2012 e-mail to Deem and Woods, as well as Wood's March 1, 2012 e-mail to Ms. Vannoy, are privileged. |
| 262 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 266 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 268 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 269 | Not privileged. (WW) | Not privileged. Whitworth's February 18, 2015 e-mail to Ms. Vannoy does not seek legal advice. |
| 270 | Privileged. (Pls.) | Privileged. |
| 271 | Not privileged. | Not privileged; relinquished on 6/27/18. |
| 272 | Not privileged. | Not privileged; relinquished via JFB Ex. 3. |
| 273 | Not privileged. | Not privileged; relinquished via JFB Ex. 3. |
| 275 | Not privileged. | Not privileged; relinquished via JFB Ex. 3. |
| 276 | Not privileged. (WW) | Not privileged. CCD 276 is a duplicate of CCD 254. |
| 277 | Not privileged. (WW) | Not privileged. CCD 277 is a duplicate of CCD 255. |
| 278 | Not privileged. (WW) | Not privileged. CCD 278 is a near duplicate of SLD 36—i.e., a spreadsheet of financial information that was sent from a non-lawyer at WW to an outside accountant. |
| 279 | Not privileged. (WW) | Not privileged in part. While it is unclear which portions of SLD 279 WW redacted, the only privileged highlighted portions are (i) the sentence beginning with "Beth" and ending with "Tammy" on WW-0154032 and (ii) the sentence beginning with "Beth said" and ending with "has to go" on WW-0154035. The remainder of SLD 279 is not privileged. |

| 280 | Not privileged in part. (WW) | Not privileged in part. As with CCD 246, the only privileged e-mails in CCD 280 are (i) Taylor's September 16, 2014 e-mail to Ms. Vannoy at 7:54 AM and (ii) Ms. Vannoy's September 16, 2014 e-mail at 4:08 PM. The remaining e-mails are not privileged. |
| 281 | Not privileged. | Not privileged; relinquished on 4/15/19. |